**JAMES M. CAPLINGER, CHARTERED, Plaintiff,**

v.

**Sharon J. LUNDGREN, Defendant.**

**Civ. A. No. 92–1308–MLB.**

United States District Court, D. Kansas.

Aug. 31, 1995.

---

Nancy M. Landis, Office of United States Attorney, Kansas City, KS, Alvin D. Herrington, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, J. Nick Badgerow, Spencer, Fane, Britt & Browne, Overland Park, KS, for plaintiff.

Charles E. Millsap, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, Mark F. Anderson, Topeka, KS, for defendant.

## MEMORANDUM DECISION

BELOT, District Judge.

This is a diversity action to recover attorney's fees. Plaintiff is a Kansas law firm. Its former client, Sharon J. Lundgren, is a resident of California. Plaintiff initially asserted theories of breach of contract and constructive trust (Doc. 1). It later amended its complaint to add theories of quantum meruit, promissory estoppel, res judicata, collateral estoppel and waiver (Doc. 46). Then, shortly before trial, plaintiff moved to dismiss all of its legal claims and try the case to the court. The court granted plaintiff's motion to dismiss its breach of contract claim (Doc. 101) and found that with all the legal claims dismissed, defendant had no right to a jury trial. Plaintiff's equitable claims of constructive trust and quantum meruit were tried to the court and an advisory jury from December 13 to December 20, 1994. The court heard the testimony of a number of witnesses and had the opportunity to evaluate their demeanor and credibility. The advisory jury found plaintiff was entitled to $261,951 for services "authorized, reasonable and necessarily rendered" to Lundgren.[1]

After presentation of all the evidence, the court directed counsel to submit written summaries of the evidence supporting their respective positions. Counsel complied and have responded to each other's submissions

---

1. The parties were given advance notice of the court's intention to impanel an advisory jury (Doc. 111). Having done so, the court is free to accept or reject the advisory jury's findings. *Gragg v. City of Omaha,* 20 F.3d 357, 358 (8th Cir.1994). As will be obvious from the findings and conclusions made herein pursuant to Fed. R.Civ.P. 52, the court has elected to reject the findings.

(Docs. 124, 126, 128–132). In addition, plaintiff has moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 (Doc. 127) and defendant has moved for a directed verdict on plaintiff's claim for quantum meruit as a matter of law (Doc. 125).[2] The court has examined the transcript, the various memoranda, its own notes and recollection of the evidence, and is ready to rule.

### Defendant's Rule 50 Motion

Defendant contends that she is entitled to judgment as a matter of law on plaintiff's quantum meruit claim. The facts necessary to rule on the motion are as follows:

1. James M. Caplinger, Chartered, is a law firm. James Caplinger is an attorney authorized to practice law in Kansas. He is the senior partner of the firm.

2. Caplinger specializes in representing independent telephone companies and has been doing so since 1961. Caplinger has practiced before state commissions as well as the Federal Communication Commission (FCC) and the Interstate Commerce Commission (ICC).

3. Caplinger has been involved in obtaining several loans for his telephone company clients, ranging from $3 million to $50 million. He also was instrumental in the development of the National Telephone Service Corporation (NTSC) which later became the Rural Telephone Finance Corporation (RTFC). RTFC is a private cooperative developed for the purpose of making loans to independent telephone companies. Because of his experience and involvement with the RTFC, Caplinger is familiar with RTFC's procedures and personnel.

4. Defendant Sharon Lundgren is currently the president of Volcano Communications Company ("Volcano"), an independent rural telephone company located in California.

5. In 1989, defendant, her parents and her brother collectively owned 55% of the stock in Volcano. Her uncle owned the balance of the stock. Defendant had entered into a stock restriction agreement with her parents and brother concerning their collective stock in Volcano, which required that before selling stock to an outsider, the parties to the stock restriction agreement first had to offer his or her shares to the other parties on the same terms. A party had 15 days after receiving notice to exercise his or her option to purchase the stock.

6. In the summer of 1989, defendant discovered that other members of her family were interested in selling their stock to outsiders. Defendant wanted to keep Volcano in the family and decided to attempt to purchase a majority interest in Volcano if her family offered her their stock pursuant to the stock restriction agreement.

7. In order to exercise the option and buy the stock, it was necessary for defendant to obtain a loan. Defendant discussed her need for a loan with a business acquaintance, Clint Frederick, an accountant in Overland Park, Kansas. Frederick suggested that defendant hire Caplinger to assist her in obtaining a loan from the RTFC.

8. On August 11, 1989, defendant met with Caplinger and Frederick in Frederick's office in Overland Park, Kansas. The purposes of the meeting were to arrange the introduction of Caplinger and defendant, to discuss her immediate need for a loan and Caplinger and Frederick's ideas for obtaining it. At the conclusion of the meeting defendant agreed to retain Caplinger.

9. The pretrial order sets forth the parties' contentions regarding the creation and scope of their attorney-client relationship:

### Plaintiff's Contentions

Defendant, a citizen and resident of the State of California, came to Kansas to meet with plaintiff in August 1989. At that time, defendant retained plaintiff to represent her in connection with her attempts to exercise an option to purchase her family's interest in Volcano Communications Company. This was to include the exercise of the option; arranging for and

---

2. The court will treat both these motions as motions for judgment as a matter of law pursuant to

Fed.R.Civ.P. 52(c).

obtaining a loan from the Rural Telephone Finance Corporation (RTFC); enforcing defendant's rights to exercise the option (including any arbitration or injunction actions necessary to enforce those rights); and all steps necessary to obtain defendant's ownership of a controlling interest in Volcano Communications Company. It was agreed that plaintiff would act as lead counsel, and would participate in, and coordinate, all activities necessary to accomplish this result.

### Defendant's Contentions

Lundgren hired Caplinger to represent her in obtaining a loan commitment from the Rural Telephone Finance Corporation (RTFC) so she could exercise her right of first refusal created by the stock restriction agreement, and later to accompany her in presenting that exercise to the Family.

While Mrs. Lundgren did hire plaintiff to assist her in obtaining a loan commitment from RTFC, and in the presentation to the family of her election to purchase the VCC stock at an hourly rate, there was never any agreement on the specific amount of the hourly rate to be paid to Caplinger. Mrs. Lundgren alleges she agreed to Caplinger's normal hourly rate.

\* \* \* \* \* \*

Mrs. Lundgren intended and understood the scope of Caplinger's employment to involve only the two matters set forth above, i.e. securing a loan commitment from RTFC and presenting her election to the Family. He was later asked to testify at the arbitration hearing. At no time did Mrs. Lundgren ask or agree to allow plaintiff or Caplinger to act as her lead counsel on all pending legal matters concerning the VCC stock dispute, nor did she request Caplinger's or plaintiff's assistance on those matters (which included making applications before regulatory authorities or representing her in the arbitration proceeding) for which she already had counsel. Thus, Mrs. Lundgren contends that there was never a meeting of the minds between Caplinger and herself as to all the terms and scope of Caplinger's employ-

ment contract for work other than securing the loan commitment and presenting the election, and therefore, Caplinger cannot charge her for work he was not employed to do, especially since he never kept her advised as to what he was doing.

10. Thus, at pretrial, the parties disputed a meeting of their minds regarding the dollar amount of Caplinger's hourly rate and the scope of his representation. At trial, Caplinger testified that he told defendant, during a conversation which took place in the car on the way to the airport, that he would bill her at his "usual rate of $200 per hour" and that defendant agreed to that rate (Doc. 117 at 76, 146, 161 and 163).

11. Defendant, on the other hand, testified that she could not recall any understanding of Caplinger's hourly rate:

Q. Tell the jury what your understanding was of what Mr. Caplinger said he would do for you and how he would charge you?

A. It was my understanding that he was going to be billing me by the hour, that he was a very fair attorney with his clients and that he felt sorry for the situation I was in, I guess, and indicated to me that if something happened and I didn't get the loan or was—perhaps didn't get the transfer notice that he wouldn't charge me at all.

Q. Did you have a discussion about what his hourly rate was?

A. I don't recall that I learned the exact hourly rate that was going to be billed.

Q. Did you have an understanding of what his hourly rate would be based on?

A. The amount of hours that he was investing in the project.

Q. I'm sorry. But did you know how much per hour you were going to be charged?

A. No, I don't recall that I had an understanding of the rate.

Q. Did you have any discussion about a usual hourly rate?

A. That was my understanding, that it was going to be billed at his usual hourly rate.

(Doc. 118 at 481–82). Later in her direct testimony, defendant stated:

Q. Do you have any problem [paying for authorized work] now knowing that his hourly fee was $200 an hour at that time?

A. I'm willing to pay that.

(Doc. 118 at 543). Defendant offers no explanation for her sudden and belated expression of willingness to pay. In her post-trial submissions, defendant states that "she agreed to pay Caplinger his usual rate of $200 per hour" (Doc. 124 at 8). However, she admitted no such agreement prior to trial or even at trial.

### Discussion

■ Defendant asserts she is entitled to judgment as a matter of law on plaintiff's quantum meruit claim because plaintiff

"... established through the testimony of James Caplinger that plaintiff and Lundgren *did* have an express agreement that plaintiff would charge Lundgren at a rate of $200.00 per hour. The law is clear that a claim for quantum meruit arises only if there is not an express agreement that governs how the plaintiff is to be paid. In other words, the absence of an express agreement is an essential element of a claim for quantum meruit.

In order to avoid a jury trial, plaintiff voluntarily dismissed its claim for breach of contract. Yet, it proceeded to prove the very agreement it had abandoned. As a result of plaintiff's procedural manipulations, it has pled itself out of a remedy.

(Doc. 125 at 2).

Plaintiff's response can be summarized: Caplinger always believed he had a full understanding with defendant regarding his fees and the scope of his duties. Defendant, however, continuously denied any agreement as to the *amount* of his hourly fee and the scope of his duties. Therefore, there was no agreement and quantum meruit applies (Doc. 130 at 2–5).

Defendant cites many cases which state the general rule that quantum meruit recovery exists only in the absence of an express agreement. A few of the cases involve attorney fee disputes. *Hapaniewski v. Rustin,* 179 Ill.App.3d 951, 128 Ill.Dec. 810, 535 N.E.2d 24 (1989) involved a contingent fee contract. However, as the court observed: "The trial court here was not presented with a single disputed fact or conflicting inference.... The only issue [was] whether the $12,000 settlement funds were 'collected' [which] is a legal determination...." 128 Ill.Dec. at 812, 535 N.E.2d at 26.

In *Musick v. Pogue,* 330 S.W.2d 696 (Tex. Civ.App.1959), the court found the "... proof of an express [attorney fee] contract is clear, positive and unequivocal. It is neither explained, modified, nor retracted...." The court held that the attorney/plaintiff's fee was limited to his express agreement and denied recovery under quantum meruit. The facts suggest that the client/defendant did not challenge the lawyer's testimony about the amount of the fee (scope of representation apparently was not an issue). Here, the proof of the existence of an agreement regarding Caplinger's fee was equivocal throughout the trial.

*Provident Land Corp. v. Bartlett,* 72 Cal. App.2d 672, 165 P.2d 469 (1946), involved an unambiguous written contingent fee contract. Not surprisingly, the court limited recovery to the terms of the contract.

Defendant also argues that since she has *now* admitted the $200 per hour fee, any dispute between the parties as to the scope of the agreement is merely a factual issue which does not negate the existence of a contract and therefore plaintiff is precluded from recovery based on quantum meruit. She supports this argument with language from *Advanced Plastics v. White Consol. Indus.,* 828 F.Supp. 484 (E.D.Mich.1993). Defendant says this case stands for the proposition that if the parties admit the existence of a contract but merely dispute its terms or effect, quantum meruit is not available. Here is the language relied upon by the defendant:

If the parties admit that a contract exists, but dispute its terms or effect, an action

882

will not also lie for quantum meruit or implied contract. *Shurlow Tile and Carpet Co. v. Farhat*, 60 Mich.App. 486, 491, 231 N.W.2d 384 (1975); *Cloverdale Equipment Co. v. Simon Aerials Inc.*, 869 F.2d 934, 939 (6th Cir.1989). In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract. *Campbell v. Troy*, 42 Mich.App. 534, 537, 202 N.W.2d 547 (1972). This is because promissory estoppel is an alternative theory of recovery where no contract exists; and, thus, it is a substitute for consideration. *See Huhtala v. Travelers Insurance Co.*, 401 Mich. 118, 133, 257 N.W.2d 640 (1977) ("Promissory estoppel ... substitutes for consideration in a case where there are no mutual promises."); *State Bank of Standish v. Curry*, 190 Mich.App. 616, 620, 476 N.W.2d 635 (1991), *affirmed in part and reversed in part*, 442 Mich. 76, 500 N.W.2d 104 (1993).

*Id.* at 491.

This court is not persuaded that *Advanced Plastics* has application to this case. First, it did not involve a dispute over the existence of a contract. The facts make it clear that a contractual relationship existed and then ceased after full performance. Second, there was no quantum meruit claim. Advanced Plastics' alternative theory of recovery was promissory estoppel. Caplinger asserted a claim of promissory estoppel in this case but dropped it at the time he made his election. In his post-trial submissions, Caplinger makes it clear that he is seeking recovery on quantum meruit only (Doc. 126 at 12). Kansas recognizes that quantum meruit and *restitution* are equivalent theories, *Hope's Architectural Products, Inc. v. Lundy's Const., Inc.*, 781 F.Supp. 711, 717 (D.Kan.1991), *aff'd*, 1 F.3d 1249, 1993 WL 298906 (10th Cir.1993). Defendant cites no Kansas case holding that quantum meruit and promissory estoppel are equivalent.

The court has read the other cases cited by defendant. No useful purpose will be served by summarizing them. None of the cases support defendant's argument that plaintiff "pled himself out of a [quantum meruit] rem-edy" by offering evidence consistent with the existence of an express contract.

Plaintiff essentially relies on one Kansas case to support his right to pursue a quantum meruit recovery: *Brakensiek v. Shaffer*, 203 Kan. 817, 457 P.2d 511 (1969). *Brakensiek* involved a dispute over commission for procuring a business. The facts indicate that plaintiff fully performed a valuable service for defendant who accepted the benefits. Scope of services was not an issue. Plaintiff claimed defendant promised to give him a "substantial check" for his services and defendant claimed he agreed to give plaintiff a case of whiskey. The Kansas Supreme Court concluded that this did not amount to an agreement as to compensation and proceeded to discuss quantum meruit recovery:

If compensation was uncertain the doctrine of quantum meruit is applicable under the rules already noted; if a misunderstanding exists as to compensation and neither party succeeds in establishing his version with the court, the law rejects the understanding of each and awards reasonable compensation. (*Brown v. Quinton*, 86 Kan. 658, 122 Pac. 116; *Turner v. Webster*, [24 Kan. 38] supra.)

We are compelled to view this case as one in which plaintiff fully performed a valuable service to defendants which was known to, and accepted by, them. The absence of a definite agreement as to compensation does not bar recovery by plaintiff. It follows plaintiff is entitled to recover on a basis of quantum meruit. (*Lambertz v. Builders, Inc.*, supra [183 Kan. 602, 331 P.2d 559]; *Millspaugh v. McKnab*, supra [134 Kan. 579, 7 P.2d 51]; *Stewart v. Fourth Nat'l Bank*, 141 Kan. 175, 39 P.2d 918.)

*Id.* at 823, 457 P.2d 511.

Plaintiff reads this language to say that since defendant, up to and even during trial, refused to admit an agreement to pay his "usual $200 per hour" rate, he was within his rights to elect quantum meruit recovery. The court does not accept this interpretation. *Brakensiek* is not directly applicable to this case; it did not involve an election between contract and quantum meruit recovery, nor was scope of representation an issue. The

most which can be said is it is closer to the mark than any of the cases relied upon by defendant and it is Kansas law.

In reality, neither of the parties has owned up to the real nature of their dispute over the existence of an agreement: a battle over tactics rather than substance. The parties agree that Caplinger had to elect between his contract and quantum meruit theories. He chose to make his election before trial, ostensibly to avoid a jury trial.[3] At the time he made his election, a dispute ("misunderstanding," to quote *Brakensiek*) persisted regarding compensation because of defendant's insistence that she did not understand Caplinger's hourly rate would be $200.

Ironically, it now appears that the dispute was de minimis, at best. Defendant could have eliminated the dispute as to compensation by admitting the $200 figure, thereby blunting Caplinger's reliance on *Brakensiek* and calling into question his ability to elect quantum meruit recovery.[4] She chose not to do so, but instead perpetuated the dispute by testifying that she could not recall any understanding about the hourly rate. Therefore, defendant is hoisted by her own petard. The court will not invalidate Caplinger's election on the basis of defendant's lawyer's non-testimonial post-trial concession which is contrary to defendant's previous testimony.

Accordingly, defendant's Rule 50 motion is denied.

### Plaintiff's Quantum Meruit Recovery

The parties do not dispute that Caplinger performed some services within the scope of his assignment which benefitted defendant. Their positions on the value of those services are far apart, however. Caplinger asserts that the quantum meruit value of his services is equal to or substantially *more* than the $261,915 he billed defendant. Defendant re-

sponds that the authorized work Caplinger legitimately performed is worth no more than $75,000 based upon 375 hours at his $200 per hour fee. The court finds the following facts to have been proved on this issue:

12. On August 17, 1989, Telephone Data Systems, Inc. ("TDS") offered defendant's family 28.5 million dollars for 100% of Volcano's stock. On September 7, 1989, defendant received notice of the offer, triggering her 15-day period to purchase the stock under the stock restriction agreement.

13. Caplinger and Frederick immediately began preparing the loan application. Caplinger considered this loan application difficult because defendant had no cash for a down payment and needed a loan for the full amount of the purchase; she had no existing corporate structure to qualify for and receive the loan; she had no experience in managing a telephone system; she needed the loan approved within a short period of time in order to exercise her option; and litigation was likely to ensue from defendant's exercise of her option because TDS, the "outsider" making the offer, had a reputation of being litigious.

14. On September 12, 1989, defendant, Caplinger and Frederick travelled to Washington D.C. to present defendant's loan application to the RTFC. The RTFC staff told defendant by the end of the day that it would recommend approval of the loan to the RTFC's board of directors. Two days later, the RTFC staff sent a letter confirming that it would recommend approval of the loan. The RTFC's board of directors officially approved the loan December 8, 1989.

15. On September 18, 1989, Caplinger, defendant and Frederick met with defendant's family in California to inform them of defendant's intent to exercise her option pur-

---

3. Caplinger's *reason* for wanting to avoid a jury trial was not stated. However, at a trial on the breach of contract theory, Caplinger would have had to prove affirmatively and specifically that he actually performed the work for which he billed defendant and that the work was authorized by defendant. For the reasons discussed elsewhere, it is now clear that Caplinger knew he would be unable to offer fully credible evidence on these issues. Therefore, he elected to pursue

his quantum meruit theory, which allowed him to avoid specific proof and rely, instead, on opinion testimony of a Texas lawyer that his overall fee was a "bargain price" (Ward Dep. at 40).

4. The dispute regarding scope of representation still would have existed, even if compensation was agreed upon. *Brakensiek* does not address this problem.

suant to the stock restriction agreement. Defendant's family refused her exercise of the option and, ultimately, sold their stock to TDS.

16. The family's refusal to honor defendant's option meant considerable legal work had to be accomplished before she could obtain Volcano's stock. The legal work included: 1) filing an injunction to prevent TDS and defendant's family from undermining defendant's right to buy Volcano's stock until the dispute over the stock restriction contract could be litigated; 2) initiating an arbitration action in California to enforce the stock restriction agreement; 3) creating a corporate structure which could receive the RTFC's loan; 4) monitoring the status of the RTFC loan;[5] 5) obtaining the approval of both state and federal regulatory agencies for the transfer of Volcano's controlling stock interest; and 6) negotiating with TDS as well as preparing for possible litigation against TDS for interfering with defendant's rights under the stock restriction agreement.[6]

17. Defendant retained a plethora of attorneys to handle these legal matters. She hired Richard Kalish, a California attorney, to litigate her arbitration and injunction actions. She hired Karen Ackerman, a California attorney, to manage corporate issues such as creating a corporation in California to receive the RTFC loan. She also hired Jeff Beck, a California attorney, to obtain approval of defendant's intended stock purchase from California's regulatory agency, the Public Utilities Commission ("PUC"). She hired Frank Fletcher, a Washington D.C. attorney, to gain approval of the stock transfer on the federal level with the Federal Communications Commission ("FCC"). Caplinger continued to be retained to handle the RTFC loan. Clint Frederick, the accountant from Overland Park, Kansas, was also involved in many of these matters but his role is not clearly defined.

18. In addition to the actual loan procedure itself, Caplinger was employed to keep informed as to the status of defendant's other legal matters to the extent necessary to adequately monitor the loan. During the fall of 1989, when the loan was being applied for, reading documents sent to him and participating in telephone conferences were within the scope of his representation of defendant. The court finds that at least some of the time Caplinger spent familiarizing himself with defendant's business and his early research into corporate law was within the scope of Caplinger's duties as defendant's counsel.

19. Caplinger also researched utility regulations at the start of the loan application process before defendant hired Beck.[7] Defendant does not dispute this early work and the court finds it to be within the scope of Caplinger's representation. It is noteworthy that for a period of time at the beginning, only Caplinger and Frederick were working on the loan. It is understandable, then, that Caplinger researched and considered regulatory matters *before* it was clear that defendant had hired other attorneys to do the work.

20. However, Caplinger knew by September 18, 1989, at least, that defendant had retained Beck to handle her California regulatory matters. After September 18, 1989, the court sees no reason why work on PUC approval was within the scope of Caplinger's employment without credible evidence showing the work was requested by Lundgren, Fletcher or Beck. Caplinger produced no such evidence. At Kalish's request, Caplinger also gathered loan documents and testified in California in an arbitration proceeding on behalf of defendant.

21. Noteworthy to plaintiff's quantum meruit claim is his self-involvement in defendant's tortious interference claim against

---

5. Although the RTFC approved defendant's loan soon after she applied, defendant could not close on the loan until she had Volcano's stock as collateral. She did not sign the definitive loan agreement until January 1990, and did not actually close on the loan until December 1993, after several legal battles to gain the stock.

6. TDS apparently encouraged defendant's family not to honor her option to purchase Volcano's stock.

7. Defendant decided to use Beck to handle the PUC approval sometime around September 5, 1989 (Doc. 118 at 478–79).

TDS. All counsel involved in defendant's efforts to buy Volcano's stock apparently believed that she had a potentially valuable claim for tortious interference against TDS. Caplinger testified that the claim could be worth $100,000,000 if defendant was successful.

22. Caplinger wanted to represent defendant on the tortious interference claim on a contingency fee basis, although he admitted he was not a trial lawyer. His intention was to have defendant retain Pedro L. Irigonegaray, a trial lawyer from Topeka, as Caplinger's co-counsel. Evidently, Irigonegaray and Caplinger would then obtain local counsel in California, where the case would be filed.

23. Caplinger proceeded to research the statute of limitations for tortious interference under California law although he knew defendant had been advised on that issue by other attorneys. Caplinger also arranged a meeting between Irigonegaray and defendant to discuss counsel for her tort claim. Defendant testified Caplinger's involvement was unsolicited, and the court accepts her testimony. Caplinger also prepared several unsolicited contingency fee contracts which he asked defendant to sign. She declined.

24. Defendant did not retain Caplinger or Irigonegaray to represent her on her tort claim or use plaintiff's research. Plaintiff billed her, however, for Caplinger's efforts to get retained on her tortious interference claim against TDS.

25. Plaintiff billed defendant for other clearly unauthorized work. Without defendant's authorization, Caplinger and Frederick organized a trust fund for her in Kansas. Defendant did not use the trust fund and testified that she was "extremely upset" when she found out that Caplinger and Frederick had arranged a trust fund for her and then billed her for it.

26. Caplinger sent defendant a bill for the first time on September 16, 1991, two years after he was retained. The bill simply stated:

Fee                                    $256,260.00
Out-of-pocket expense                     5,655.73
    Total ........................ $261,915.73

This bill included time Caplinger had charged separately in his statement submitted to the arbitrator in March 1990 which defendant had not paid (see, *infra,* for a more detailed discussion of this statement).

27. Defendant was surprised by the amount of the bill and asked for an itemized statement in a letter dated October 3, 1991. Caplinger understood that his bill was in dispute.

28. About this time, Caplinger discovered that defendant had received his attorney's fees for work related to the arbitration proceeding but that she had signed the entire award over to Kalish's law firm. Upset by this, Caplinger did not send her the itemization she requested. Caplinger contends that he withheld the itemization for five months while he attempted to collect the arbitration money from either Kalish or defendant.

29. On February 20, 1992, five months after defendant's request that he itemize his bill, Caplinger finally provided an itemized statement. It was not printed from his computer records, but rather typewritten manually, using the computer records as a reference. Caplinger testified that he did not send defendant the computer records because the computer records included time entries for his arbitration work, which he had already itemized in a statement submitted to the arbitrator. Caplinger declined defendant's request to allow an independent auditing company to audit his bills, allegedly because they contained entries regarding other clients.

30. Caplinger no longer has the computer records. When asked what happened to them, Caplinger testified:

A: They were destroyed as we always do.

Q: You always destroy 'em?

A: Whenever any kind of billing program we've used over the years, once you get paid there's no requirement to maintain them and we, in this situation, we had prepared documents that showed the information. We didn't think it was necessary to keep supporting information for what had been physically prepared.

(Doc. 117 at 257). If the records were destroyed, the destruction occurred after Caplinger knew his bill was disputed.

31. At trial, Caplinger offered almost no supporting documentation to justify his "itemized" statement. Rather, Caplinger relied primarily upon his own testimony and the opinion of John Ward to establish the reasonableness of his fee.

32. John Ward is a Texas attorney with considerable skill and experience as a litigator. He became acquainted with Caplinger when he was representing contractors in matters such as cost overrun litigation. Ward testified that he soon learned Caplinger was very knowledgeable in subjects pertaining to rural telephone companies and was held in high regard by the staff of RTFC.

33. Prior to formulating his opinion, Ward reviewed Caplinger's lump sum and "itemized" bills, his letters to defendant regarding the bills, and various documents pertaining to Caplinger's separate bill for services in the arbitration case. He had some minimal information about the fee dispute, although its source was not made entirely clear. He did *not* review Caplinger's or defendant's depositions. Some of his information was incorrect. For example, Ward testified that he believed Caplinger and defendant had agreed on an hourly rate (Ward Dep. at 68).

34. Based upon this information and certain assumptions about Caplinger's successful efforts to obtain a loan commitment from the RTFC in a short time frame, Ward opined that the reasonable value of Caplinger's services ranged from $250,000 to $350,000 (Ward Dep. at 35–36). He reached this opinion by analogizing Caplinger's work to that of a loan broker whose fees are a percentage of the loan obtained through the broker's efforts.

35. On cross-examination, Ward conceded that he had never obtained a loan from the RTFC for a client, nor ever acted as a loan broker or finder. Rather, his experience had been in litigation involving loan transactions. He also conceded that loan brokers customarily work on a contingency, whereas Caplinger was working on an hourly basis. He admitted that if a lawyer initially agrees to work on an hourly basis to obtain a loan, he cannot later demand a fee based upon a percentage of the loan.

36. The court assigns no weight to Ward's opinion regarding the reasonableness of Caplinger's fee. First, the foundation for his opinion is essentially absent. Ward knew very little about what was involved in the work Caplinger *did do* for defendant and almost nothing about the very legitimate dispute over what he did without authority or did not do at all. Second, and more fundamentally, Ward based his opinion on the activities of a loan broker who works on a contingent, percentage basis while at the same time acknowledging that Caplinger was doing legal work by the hour. This amounts to an "apples and oranges" comparison, pure and simple. Plaintiff appears to recognize this because it does not rely upon Ward's broker analogy in its post-trial submissions.

37. This leaves Caplinger's own testimony with respect to the scope of his representation, the work he actually performed for defendant and, ultimately, the reasonableness of his fee.[8]

38. The starting point in determining the scope of Caplinger's representation is his failure to provide documentary support for his assertion that defendant agreed that he was to act as "lead counsel" for all matters in which she would be involved. Caplinger testified that he never writes so-called "engagement letters" to his clients and does not send

---

8. The court has not overlooked the testimony of Clint Frederick, but it sheds little light on the issues. Basically, Frederick merely confirmed, in general terms, that Caplinger did certain work which defendant does not dispute anyway. On other matters, Frederick's credibility is *highly* questionable. He is Caplinger's friend and to some extent, Caplinger's associate in business dealings. Defendant is in arrears to Frederick for more than $150,000. Frederick was involved with Caplinger in the unsolicited and unapproved attempt to foment additional litigation and establish a "legal defense fund" for defendant. Both Caplinger and Frederick planned on gaining a financial benefit from this inappropriate undertaking.

The court disregards Frederick's testimony because of his lack of credibility and because of his bias.

periodic statements for services. Thus, the only evidence to support Caplinger's self-designation is his testimony, which must be viewed in light of hard facts which show that Caplinger did not act as "lead counsel" and, in reality, had no skill or expertise to do so. Ironically, some of the strongest evidence that Caplinger was not "lead counsel" for the diverse matters in which defendant was involved is that his expertise is narrowly confined to the rural telephone industry.

39. A second failure is the cryptic nature of entries such as "office work" and "research," which are of little assistance in determining the specific work performed and billed for. It cannot be overlooked that these cryptic entries ostensibly cover *hundreds* of hours of legal work, which leads to the third failure: the virtual absence of any documentary support for such entries. It has been the court's experience, both as a lawyer and judge, that lawyers who do extensive legal research generate, at the very least, notes, memos to the file or some other form of work product, particularly on long-term or complicated projects. No such evidence was forthcoming. "Office work" is so general that it is meaningless in the absence of a credible explanation of what work was included in the designation. In effect, Caplinger had "nothing to show" for all the "research" and "office work" he supposedly did. The fourth failure is that if Caplinger did have supporting documentation, he destroyed it, which supports an inference that the documentation would not have substantiated his statement. These failures, coupled with other factors listed *infra*, call into serious question the evidentiary sufficiency of Caplinger's proof, even on those matters on which it is conceded he performed *some* services. The following examples are illustrative:

40. The billing entries of September 1 through September 4, 1989, state Caplinger did "office work on loan" and had telephone conferences. Caplinger produced no work product for this time period. September 4, 1989, was Labor Day. On that day, Caplinger charged defendant 6.3 hours for several telephone calls to the RTFC and "loan application." Caplinger's telephone records, how-

ever, show no calls to the RTFC on that day. He offered no evidence that the RTFC staff was working on Labor Day.

41. Caplinger attended a conference in Boston on October 3. On October 4 he drove to Maine, where he stayed on vacation until October 6. Caplinger charged defendant 10.8 hours for October 3 through October 6, 1989, for "office work" and "research," allegedly necessitated by "volumes of material" that defendant had faxed him during the conference in Boston. Caplinger presented to the court a three-page faxed document in support of his charges but did not offer it into evidence. Caplinger admitted he brought no research books with him on his trip. He offered no credible testimony regarding how he could do "office work" while on vacation.

42. The time charged October 10 through October 19, 1989, shows Caplinger did "office work on loan and regulatory filings," "filed complaint with Superior Court," "PUC actions," and "research and office work" as well as several conference calls. Caplinger admitted at trial that he did not file any pleadings in California. Caplinger was aware by this time that Beck and Fletcher were handling the regulatory matters and that Ackerman handled the corporate matters. Caplinger presented no documents to show what work he accomplished during this period.

43. Caplinger flew to Washington D.C. on January 8, 1990, to be present when defendant signed the loan closing documents. Caplinger billed defendant for 17 hours. Previously he had submitted a statement to the arbitrator for an additional 3.8 hours. Similar double-billing is found throughout the two statements. The court declines to give full credit to double charges in the absence of a credible explanation or documentation showing what work was done and why it was allocated between the two matters.

44. Caplinger's entries from January 31 through February 9, 1990, show work on regulatory matters and "office work." Working on regulatory matters was outside the scope of Caplinger's representation of defendant absent credible and verifiable evi-

dence that Beck, Fletcher or defendant asked Caplinger to work on them.

45. From March 5 to March 10, 1990, Caplinger charged defendant for a reply brief to FCC on TDS filings, office work, arbitration matters, and telephone calls. It is undisputed that Caplinger did not prepare any regulatory filings and that he itemized the arbitration work separately.

46. The billing entry on April 23, 1990, states Caplinger travelled to Washington D.C. to discuss the loan with the RTFC. He billed defendant for a conference with Fletcher the next day, on April 24, 1990. Defendant testified that she was unaware of Caplinger's trip to Washington until he sent his bill. Caplinger admitted he did not seek defendant's permission before he travelled to Washington at her expense (Doc. 117 at 242). There is no evidence regarding why Caplinger had to go to Washington. Andrea Robel testified that, in her opinion as loan officer of the RTFC, Caplinger's trip to Washington was unnecessary.

47. Caplinger billed defendant for telephone calls, developing a closing agenda, "office work," arranging travel to California and various other matters during the period from May 17 to June 27, 1990. There was no evidence as to why Caplinger would have had to travel to California after the arbitration hearing in January, 1990. He did go to California in March 1991, but his charges relating to that work are illegitimate (see ¶ 50, infra). Caplinger produced no evidence to support the various "office work" entries, nor did he produce phone records to substantiate the many long-distance telephone conversations in which he supposedly took part.

48. Caplinger travelled to Washington again on June 28, 1990, to "finalize loan documents" which Caplinger testified were completed in January 1990. Again, defendant was not aware that Caplinger made this trip until after she received his bill.

49. During the period of June 29 through July 19, 1990, Caplinger charged defendant for research on corporate matters, preparation of closing agenda and "office work" in one form or another. Caplinger proved none

of the hours were authorized, reasonable or necessary or, for that matter, that the work was even done.

50. The billing entries from October 22, 1990, through March 9, 1991, state: "office work on loan, closing agenda," "injunction," "office work on loan and related matters, research tortious interference," "office work," "request RTFC for extension of loan draw down, office work," "travel to KC for conf. with F & W" as well as telephone calls. Researching the tortious interference claim and working on an injunction were outside the scope of Caplinger's representation of defendant and thus unnecessary and unreasonable. Caplinger's work on the loan was completed by this time.

51. On March 10 and 11, 1991, Caplinger was in Santa Barbara at a conference. While there, he informally talked with some TDS employees who were also attending the conference. Caplinger testified that he told the employees from TDS that "they didn't have a case and they better settle with Sharon ..." (Doc. 117 at 243). The billing entry for March 10 shows Caplinger spent 3 hours talking with TDS personnel yet Caplinger testified that he talked to them for "the better part of an hour" (Doc. 117 at 245). The billing entry for March 11 charges defendant 1.1 hours for a telephone call between Caplinger and defendant, during which Caplinger reported to defendant his conversation with the TDS personnel. Phone records show Caplinger spent only 27 minutes on the phone with defendant on March 11 (Doc. 117 at 247). Caplinger admitted his billing entry for March 11 was a "mistake" (Doc. 117 at 247). Defendant testified she did not authorize Caplinger to meet with TDS personnel.

52. The billing entries from March 22 through May 2, 1991, list Caplinger's activities as "review brief," "office work, reviewed brief of appeal," "office work, prepared requested contract of employment," "travel to KC, conf. with F & W," "office work," "travel to Washington D.C., conf. with RTFC on loan, litigation, and acquisition status," "prepared, provided SL with contract," and "prepared letters," as well as telephone calls. Caplinger was not authorized to prepare a

contingency fee contract for defendant. Caplinger was not authorized to take trips to Washington D.C. to confer with RTFC. Caplinger's trip to Kansas City to confer with Frederick, presumably about the suit they were encouraging, was unreasonable and unnecessary.

53. From May 9 through 15, 1991, Caplinger charged defendant 11 hours for preparing an escrow account for a legal defense fund. This work was not authorized by defendant.

54. The billing entries from May 22 through June 20, 1991, charge defendant for yet another trip to Washington D.C. and telephone calls. Caplinger's trip to Washington D.C. was not authorized by defendant.

55. These examples highlight some of the deficiencies in Caplinger's proof. There are others, but no point would be served by trying to list all of them. The deficiencies raise serious questions regarding Caplinger's credibility and professional conduct. Of great significance is Caplinger's failure to address these deficiencies in any meaningful manner at trial or in any of his post-trial submissions.[9] The only conclusion which the court can draw from the entirety of the evidence, as well as logical inferences which flow from Caplinger's failure to produce evidence, is that many of the entries on his "itemized" statement are overstated or fraudulent.

### Discussion

▉ *City of Wichita v. Chapman,* 214 Kan. 575, 586, 521 P.2d 589 (1974), sets out the factors to be considered in determining a reasonable attorney's fee:

'The circumstances to be considered in determining the compensation to be recovered are the amount and character of the services rendered; the labor, time and trouble involved; the nature and importance of the litigation or business in which the services were rendered; the responsibility imposed; the amount of money or the value of the property affected by the controversy, or involved in the employment; the skill and experience called for in the performance of the services; the professional character and standing of the attorney; the results secured; ...' (6. C.J. 750.) (See, also, 5 Am.Jur. 379.) (p. 636.)

The *Chapman* factors have been cited and applied in this court. *Kansas Turnpike Authority v. Morgan Guar. Trust Co.,* 751 F.Supp. 936, 941 (D.Kan.1990). Of course, the trier of fact is entitled to consider the credibility of witnesses and the weight and sufficiency of the evidence. The Tenth Circuit has recognized that inconsistent and contradictory records kept by an attorney have little probative value. *Frank v. Bloom,* 634 F.2d 1245, 1254 (10th Cir.1980). Kansas follows the rule that the failure of a party to give evidence on an issue particularly within his own knowledge raises a presumption that the evidence not produced is unfavorable to that party. *Blackburn v. Colvin,* 191 Kan. 239, 244, 380 P.2d 432 (1963).

There is no question that Caplinger performed a valuable service for defendant by helping her secure a loan from the RTFC. The loan commitment eventually allowed her to gain majority ownership of her company. Caplinger's experience and familiarity with the RTFC procedures and his influence with its staff apparently were very important to the success of the loan application process and undoubtedly were a significant factor in the board's decision to approve the loan in the short time period available. Defendant acknowledges that plaintiff is entitled to a fee for these services.

▉ However, it cannot be forgotten that plaintiff bears the burden of proof. Defendant did not have any burden to disprove plaintiff's claims although, as a practical matter, she assumed that burden, with considerable success. Next, the court agrees with defendant that it "... is extraordinarily difficult from the evidence introduced by plaintiff and descriptions on Caplinger's bill to deter-

---

9. The court cannot determine whether Caplinger has failed to address the deficiencies in his bill because he has no response or whether he believes he is not required to do so because he is seeking a quantum meruit recovery. If it is the latter reason, the court rejects it. Caplinger selected the hourly method of billing and he is seeking to recover for *all* the hours billed. Thus, he cannot escape scrutiny of his billing practices.

mine with any hope of precision exactly how many hours Caplinger worked and how many of those hours were on matters that were authorized, necessary and reasonable" (Doc. 124 at 30). Further, mere lack of precision is not the only difficulty with plaintiff's evidence. As the court has already observed, plaintiff seeks to recover not just for Caplinger's work in securing the loan, but for hundreds of additional hours allegedly spent on other matters; yet plaintiff's evidence, according to the *Chapman* factors, is virtually non-existent with respect to the other matters. Finally, and sadly, the entirety of plaintiff's case is severely undermined and compromised by the evidence, much of which is uncontroverted, that when confronted by defendant's proper demand for an itemized statement, Caplinger produced a bill which is shot through and through with unsupported and *unsupportable* time entries, and then destroyed records which conceivably could support the entries. Under these circumstances, Caplinger's own improper and unprofessional [10] conduct bars plaintiff from the full equitable recovery it seeks.

56. In determining the reasonable value of Caplinger's services, the court considered: 1) early billing entries when Caplinger did a substantial amount of work on the loan; 2) billings consistent with testimony presented at trial, for example, Caplinger's presence in California when defendant exercised her option under the family's stock purchase agreement; 3) billing entries consistent with documents Caplinger introduced as evidence of his work product; and 4) the time, ironically, that defendant proved Caplinger spent on the telephone on her legal matters.[11]

57. The court did not consider: 1) billings for unsubstantiated "office work;" 2) time entries proven inaccurate; 3) time entries indicating work by Caplinger's son, James M. Caplinger, Jr.; 4) time reflecting work on corporate or regulatory matters after Caplinger knew defendant had retained Beck, Ackerman and Fletcher; 5) time spent on trips to Washington without defendant's knowledge or consent; 6) time spent on the legal defense fund or the tortious interference claim against TDS; or 7) the time entries reflecting work on arbitration matters, as Caplinger itemized this work separately in his statement to the arbitrator.[12] Further, given Caplinger's inaccuracies and tendency to overbill, the court has given half credit to time billed after September 21, 1989, when the loan work was essentially completed and

10. The court recognizes that this is not a disciplinary proceeding and the court's references to unprofessional conduct should not be viewed as a finding that Caplinger should be disciplined. (Ironically, Kansas's current Disciplinary Administrator previously represented defendant in *this* case.) Nevertheless, unprofessional is an apt term and Caplinger's conduct would be unprofessional if he was a plumber, architect, accountant or anyone else who elects to charge by the hour. Perhaps most unfortunate of all, Caplinger could have avoided much of the criticism of his fee and bill by following simple, common-sense practices. Shortly before Caplinger became involved with defendant, an article appeared in the Journal of the Kansas Bar Association in which the author noted, in pertinent part:

**Fee Disputes**
A written agreement which sets forth specifically the fees and the bases for computing the fees is always preferred. The client should be billed periodically and the attorneys should maintain detailed and complete time records for all services rendered, including hours and description of services.

\* \* \* \* \* \*

The enormous increase in the number of malpractice claims warrants the implementation

and periodic review of preventative procedures. New associates and practitioners should develop good habits such as those outlined above to decrease the likelihood of a malpractice claim.
Anne Burke Miller, *Attorney Malpractice: Prevention Suggestions*, KBAJ, Vol. 57, No. 3, March 1988.

11. Caplinger billed defendant numerous hours for time spent on the phone but did not substantiate them at trial. Defendant, however, offered portions of Caplinger's phone records into evidence to show Caplinger charged her for phone calls unrelated to her legal matters and to prove he overbilled or fraudulently billed her. In the process, defendant testified of the time Caplinger in fact spent on the phone, which the court has considered.

12. Some of Caplinger's "work on loan" entries were made after Kalish requested Caplinger to prepare certain loan documents, earlier than actually needed, for use at arbitration. Caplinger's truly loan-related work at that time was essentially over. The court did not consider these "work on loan" entries as Caplinger testified at trial he billed all the time he could to arbitration.

Caplinger's duties were limited to monitoring the loan.

58. In light of the above considerations and with the *Chapman* factors in mind, the court finds that $15,762 is a reasonable fee for the work Caplinger performed for defendant.[13]

*Plaintiff's Rule 50 Motion*

Plaintiff seeks judgment as a matter of law on its constructive trust claim. The facts necessary to rule on this motion are as follows:

59. The stock restriction agreement required that any dispute regarding the agreement be determined by arbitration. At the request of Richard Kalish, defendant's trial lawyer at the arbitration, Caplinger prepared for the arbitration as a witness, travelled to California and testified before the arbitrator.

60. Eventually, the arbitrator found in favor of defendant and ordered defendant to submit statements of attorneys fees and expenses. On March 2, 1990, Caplinger furnished Kalish with a verified statement showing fees and expenses totalling $57,985. Caplinger's fees were billed at his "usual $200 per hour rate."

61. Kalish submitted Caplinger's statement to the arbitrator along with his own affidavit stating that all the fees and expenses sought by defendant were "very reasonable." Neither defendant nor Kalish questioned Caplinger's charges.

62. The arbitrator awarded defendant $250,000 in attorney's fees and costs. By the time the award was paid, accrued interest increased the amount to $352,000. The payment was received by defendant, who immediately signed over the entire payment to Kalish's law firm. According to Caplinger:

Q. What discussion did you have with Mrs. Lundgren about why she wasn't paying you what the arbitrator had awarded her for your efforts?

A. Well, the best I could get out of her was she was afraid of Mr. Kalish and she needed to pay him.

(Doc. 117 at 129). Defendant was not specifically asked at trial why she did not pay Caplinger's arbitration fee.

*Discussion*

A constructive trust arises where a person by fraud, actual or constructive, or by any form of unconscionable conduct or questionable ethics, has obtained or holds title to property which in equity and good conscience she ought not to possess or which justly belongs to another. *Estate of Burcham,* 248 Kan. 897, 903, 811 P.2d 1208 (1991).

Fraud, actual or constructive, is an essential element of proving a constructive trust. *Kampschroeder v. Kampschroeder,* 20 Kan.App.2d. 361, 364, 887 P.2d 1152 (1995). Constructive fraud is a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence. *Id.* (citations omitted). Absent actual fraud, there must also be a breach of a confidential relationship. *See id.* at 364–65, 887 P.2d 1152.

The court finds plaintiff has proven by clear and convincing evidence that a constructive trust existed regarding the arbitration award. The award was designed to reimburse defendant for the fees she owed to her attorneys for their work on the arbitration, and was based upon the understanding that it would be used for that purpose. It was not awarded to pay defendant's general legal debts. Defendant's assignment of the entire award to Kalish's firm for debts unrelated to Kalish's fees in connection with arbitration, combined with her belated denial of the validity of Caplinger's verified statement from which she accepted the fees, amounts to constructive fraud on both Caplinger and the California arbitration court. To allow defendant's retention of Caplinger's fees without his reimbursement of the same amounts to an unconscionable windfall to defendant.[14]

---

**13.** This does not include Caplinger's arbitration work, which is discussed below.

**14.** Defendant argues, without citation to authority, that the arbitration bill Caplinger submitted at

Kalish's request also is subject to the same quantum meruit scrutiny as the $261,000 bill he submitted to defendant (Doc. 128). This argument is bogus. Kalish, acting as defendant's agent,

The court accordingly finds a constructive trust was created in plaintiff's favor in the amount of $57,985 and grants plaintiff's motion for judgment as a matter of law.

### Prejudgment Interest

The general rule in Kansas is that prejudgment interest is allowable on liquidated claims. *Federal Land Bank of Wichita v. Vann*, 20 Kan.App.2d 635, 641, 890 P.2d 1242 (1995). A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain. *Id.*

Caplinger's claims for his fees and expenses for the arbitration became liquidated on September 16, 1991, when he sent defendant the first bill for his legal fees and terminated their professional relationship. Defendant either knew, or her agent, Kalish, knew from the date Caplinger submitted his fee statement to the arbitrator the *amount* that she owed Caplinger for his work related to the arbitration, but the amount did not become *due* until September 16, 1991.[15] Defendant also knew the exact amount of Caplinger's expenses on September 16, 1991.[16] Thus, both the amounts and the due date are fixed and certain from September 16, 1991. The equitable nature of Caplinger's claims does not dissuade the court. *See Hile v. DeVries*, 17 Kan.App.2d 373, 375–76, 836 P.2d 1219 (1992); *Federal Land Bank of Wichita*, 20 Kan.App.2d at 642, 890 P.2d 1242 (prejudgment interest applies to both express and implied contracts).

The court finds that prejudgment interest on $57,985 is justified under the circumstances of this case at the statutory rate of 10%, *see* Kan.Stat.Ann. § 16–201, and accruing from September 16, 1991.

IT IS ACCORDINGLY ORDERED that 1) defendant's motion for directed verdict (Doc. 125) is DENIED and that judgment be entered for plaintiff in the sum of $15,762 for services, plus $2,850 in expenses, for a total of $18,612 on plaintiff's quantum meruit claim;[17] and 2) that plaintiff's motion for judgment as a matter of law (Doc. 127) is GRANTED and that judgment be entered for plaintiff in the amount of $57,985 on his constructive trust claim. Plaintiff is entitled to prejudgment interest at the rate of 10%, accruing from September 16, 1991, on $57,985.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 10 pages and shall strictly comply with the standards enunciated by this court in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan.1992). The response to any motion for reconsideration shall not exceed 10 pages. No reply shall be filed.

IT IS SO ORDERED.

---

did not question Caplinger's bill, the full amount of the bill was approved by the arbitrator and was received by defendant. Even if defendant paid the entire award to Kalish's law firm because she was "afraid" the firm might withdraw (and no facts were ever offered to prove it), this does not constitute any legal excuse for her failure to pay Caplinger's arbitration bill.

15. Caplinger testified, "[I told Lundgren] I wouldn't bill her as long as I was her lawyer. I mean until the matter was resolved" (Doc. 117 at 161).

16. Defendant does not dispute Caplinger's expenses and proposes the court include them its judgment (see Defendant's Proposed Findings of Fact and Conclusions of Law, Doc. 124 at 45).

17. As noted earlier, defendant does not dispute plaintiff's expenses. Plaintiff claims a total of $5,655.73 in expenses which defendant suggests the court include in its judgment. Caplinger itemized $2,805.70 of these expenses separately in his statement to the arbitrator, which is included in the court's judgment on plaintiff's constructive trust claim.