**ADVANCED PLASTICS CORPORATION, Plaintiff,**

v.

**WHITE CONSOLIDATED INDUSTRIES, INC., d/b/a Frigidaire Company, Defendant.**

No. 92–CV–76375.

United States District Court, E.D. Michigan, S.D.

Aug. 4, 1993.

Kurt E. Riedel, Plunkett, Cooney, Mt. Clemens, MI, for plaintiff.

Stephen D. Winter, Patrick F. Hickey, Dykema Gossett, Detroit, MI, for defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

### Background

Plaintiff, Advanced Plastics Corporation ("Advanced Plastics"), manufactures plastic parts for refrigerators. Defendant White Consolidated Industries Inc., d/b/a Frigidaire Co. ("White Consolidated"), manufactures refrigerators. They had a contractual relationship in accordance with which plaintiff produced such plastic parts for defendant for use in its refrigerators. The contract is comprised of blanket purchase orders and releases. Deposition of plaintiff's president, Ronald Printz ("Printz"), at pp. 109–113.

The relationship between the parties is as follows. When defendant desired a part from plaintiff, defendant would submit a request for quotation to plaintiff. The request for quotation included the part name, part number, and estimated yearly usage. An estimate of defendant's yearly consumption allowed plaintiff to determine and price the quantity of tooling necessary to fulfill the anticipated annual usage. Deposition of defendant's buyer, Barbara Dakin at pp. 22–27. The request for quotation contained the following statements: "Estimated yearly usage is estimate only. Do not construe as firm commitment." Plaintiff would then produce a quote which stated: (1) materials involved in the production of the part and (2) estimated price the defendant would have to pay to buy such a part. If the price was agreeable to defendant, it would submit a purchase order to plaintiff which identified the part or parts defendant wished to buy from plaintiff but it did not state the quantity of parts; thus, the purchase orders were known as blanket purchase orders.

These blanket purchase orders contained various terms and conditions. Paragraph 4 of the terms and conditions to the blanket orders provided in relevant part:

> Where this contract is for purchase and sale of a stated quantity, Buyer [defendant] shall not be obligated to purchase any additional quantity. In the case of Blanket Orders, (a) Seller [plaintiff] agrees to furnish Buyer's requirements for the goods or services covered by this Purchase Order to the extent of and in accordance with the delivery schedule set forth therein, or, if no such schedule is set forth, then pursuant to Buyer's written instructions, (b) Buyer shall have no obligation to honor invoices for goods or services fabricated, rendered, or delivered other than according to the delivery schedule or written instructions of Buyer pursuant to (a) above, and (c) Buyer shall be entitled to make other purchases at its discretion in order to assure its production operations and maintain reasonable alternative sources of supply.

Because the blanket orders did not have delivery schedules, the quantity of parts that defendant wished to buy from plaintiff was governed by defendant's written instructions, known as releases. Defendant was not obligated to pay for any parts or raw materials until a release was issued. Printz deposition at pp. 90–92, 106–108, 111–112, 166–171, and 188–190.

As with the blanket purchase orders, the releases were also subject to terms and conditions. Paragraphs 2 and 9 of the Release Terms and Conditions for Business Documents Transmitted Electronically provide:

> 2. DO NOT FABRICATE PARTS REQUIRED FOR EACH SHIPMENT MORE THAN 45 DAYS IN ADVANCE OF SPECIFIED DELIVERY DATE. You should release materials from your vendors for shipment to your plant only as necessary to maintain the shipping schedule as shown on this release.
>
> ....
>
> 9. If at any time the quantities ordered herein are by us reduced or cancelled, we neither have nor assume any liability or obligation for damages nor for value of materials fabricated or partially fabricated

in quantities in excess of our delivery schedule for the sixty-day period immediately following our notice of reduction or cancellation.

Since 1985, the parties had utilized this procedure whenever defendant purchased parts, known as line 1 parts. In May 1991, defendant began to purchase a new line of parts, known as line 5 parts, for use in defendant's refrigerator models. In 1992, economic realities forced defendant to consolidate its supplier base; defendant decided to move all its line 1 and line 5 tooling from plaintiff to another supplier, Drake Molding Corporation. On April 28, 1992, defendant informed plaintiff of its decision to cease its business relationship with plaintiff. At this time, annual existing sales for line 1 parts were approximately $1.2 million, and line 5 part sales, based upon open purchase orders, were projected to be about $1 million. By June 25, 1992, all releases which had been issued by defendant to plaintiff had been filled, and all parts and raw materials were invoiced and paid for. Printz deposition at pp. 108–109, 115, 125–126, 156–168.

Count I claims breach of contract. Count II is a promissory estoppel claim. Plaintiff says that as a result of the assurances of defendant, plaintiff purchased real estate, machinery and equipment; hired personnel; and incurred other expenses. It also claims it turned away other business. It says that as a result of defendant's actions, it was forced to lay off employees and had real property to maintain and machinery no longer needed. Plaintiff says it had spent $120,-000 to acquire such real property to make it environmentally safe; it says it had also acquired a Toshiba molding machine for $169,-000 and a computer system for $10,000 to decrease the delay in providing defendant with the parts it requested. Defendant's action left plaintiff without 40% of its sales.

Pursuant to Fed.R.Civ.P. 56, defendant moves for summary judgment. For the rea-sons set forth below, defendant's motion is GRANTED.

*Analysis*

I. *Count I*

A. *No termination*

■ Defendant persuasively argues that pursuant to the terms of the agreement between the parties, the contractual relationship between them simply ceased. As a matter of law, there was no premature termination of the contract by defendant.

Under the express terms and conditions of the releases, specifically paragraphs 2 and 9 quoted above, defendant was not obligated to pay for parts manufactured more than 45 days in advance of the scheduled delivery date identified in the release. If a schedule or release was cancelled or reduced, defendant was obligated to pay for only those raw materials or that work-in-progress necessary to meet the delivery schedule for 60 days following the reduction or cancellation. Under such terms and conditions, whenever defendant no longer desired to order line 1 or line 5 parts from plaintiff, it could simply cease issuing releases against the blanket orders and the obligation of defendant to purchase parts would end. Printz deposition at pp. 90–92.

This account describes exactly what occurred. On April 28, 1992, defendant informed plaintiff that due to economic realities it could no longer order line 1 or line 5 parts from plaintiff. By June 25, 1992, all releases which had been issued by defendant to plaintiff had been filled; further, all parts and raw materials were invoiced and paid for.

■ The yearly estimates or projections which defendant provided on its requests for quotations and thereafter did not obligate it to purchase line 1 or line 5 parts. As noted, the requests for quotations state: "Estimated yearly usage is estimate only. Do not construe as firm commitment."[1] *See also*

---

1. Plaintiff cites M.C.L. § 440.2306(1), U.C.C. § 2–306(1), for the proposition that defendant could not suddenly stop requesting future parts any time it wished. This section provides:

    Output, requirements. A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably dis-

*Northern Indiana Public Service Co. v. Colorado Westmoreland, Inc.,* 667 F.Supp. 613 (N.D.Ind.1987), (Easterbrook, J., sitting by designation), *affirmed without opinion,* 845 F.2d 1024 (7th Cir.1988). In that case, Judge Easterbrook held that a coal supply contract which required a utility company to advise a coal supplier of the quantity of coal the utility company would require over the course of the year did not obligate the utility company to purchase such an amount as it was merely an estimate.

Thus, I find that defendant performed its obligations under this contract for the sale of goods; the contractual obligations of the parties simply expired. There was no termination of contract as defined under the Uniform Commercial Code ("U.C.C."). M.C.L. § 440.2106, U.C.C. § 2–106, says in part, " 'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach." Defendant stopped issuing releases, and it no longer had a contractual obligation to purchase parts from plaintiff. The contract expired; defendant did not "terminate" it. Defendant did all that it was required to do under the contract, and it is entitled to summary judgment on Count I.

Such a result, plaintiff argues, produces an unfair result. There is no question that the terms of this contract are tough terms. Sympathy for plaintiff's position does not change the result. Plaintiff's difficulty is a result of the type of contract it negotiated and to which it agreed. It seems clear that plaintiff, in order to obtain defendant's business, agreed to terms that favored defendant. Defendant had the power to dictate the terms, and did so.

To hold otherwise, I would have to rewrite the terms of the contract. "Courts can neither make a new agreement for the parties nor, by addition, give it a meaning contrary to its express and unambiguous terms." *Stein, Hinkle, Dawe & Associates, Inc. v. Continental Casualty Co.,* 110 Mich.App. 410, 418, 313 N.W.2d 299 (1981). "Under the guise of interpretation a court may not reform or modify a contract. Contracts which are unambiguous are not open to construction and must be enforced as written." *Britton v. John Hancock Mutual Life Insurance Co.,* 30 Mich.App. 566, 569, 186 N.W.2d 781 (1971). *See also Kelsey–Hayes Co. v. Maleki,* 765 F.Supp. 402, 404 (E.D.Mich.1991).

**B. No breach**

Alternatively, even if, as plaintiff suggests, defendant "terminated" the contractual relationship, defendant would still be entitled to summary judgment as to Count I because there was no breach. Relevant sections of statutory law are subsections (2) and (3) of M.C.L. § 440.2309, U.C.C. § 2–309, which state:

(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.

**1. Indefinite duration—reasonable time**

In the contract, paragraph 11 of the Release Terms and Conditions for Business Documents Transmitted Electronically ("Release Terms and Conditions") provides:

proportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
This section is inapplicable to the situation at hand because the parties did not have a requirements contract obligating defendant to purchase all of its requirements for the specific parts ordered from plaintiff. To be a requirements contract, the agreement itself must provide that the buyer will buy all of its needs or requirements from the seller. *In re Atlas Concrete Pipe Inc.,* 668 F.2d 905, 910 (6th Cir.1982). The purchase orders and releases in this case expressly provided that defendant was obligated to purchase only those parts for which it issued releases and only for 45 days in the future. There was no obligation that defendant purchase all of its needs or requirements from plaintiff.

11. Termination

(a) The buyer may terminate all or any part of this order, without liability to the Seller, by written notice of default if Seller fails to perform its obligations under this order as specified, or so fails to make progress as to endanger performance under this order and in accordance with its terms.

(b) In the event of Seller's default or apparent inability to perform this order, Seller agrees upon demand by Buyer to deliver to Buyer the raw materials and work in process acquired in order to perform under this order, and Buyer may then complete the work deducting the cost of such completion from the price, or in the alternative, pay to Seller the reasonable cost of such raw materials and work in process.

■ One instance when a seller may fail to perform its obligations is when it fails to meet delivery dates, specifications, and quantities. Under such circumstances, plaintiff argues, a buyer may cancel all or part of the order. Paragraph 3 of the Release Terms and Conditions. Further, paragraph 13 of the Release Terms and Conditions provides that bankruptcy of either party or an assignment by either party for the benefit of creditors is a material breach.

With such terms and conditions in the contract, plaintiff argues that as long as it manufactures quality parts and delivers them on a timely basis, defendant is obligated to purchase such parts for the life of that part. Neither party contends that plaintiff performed poorly or made deliveries on an untimely basis. Thus, plaintiff caps its argument by saying that because various contingencies which would allow defendant to terminate the contract have not occurred, defendant cannot terminate the contract.

This is a curious argument. Plaintiff says that inasmuch as the contingencies are inapplicable to the situation at hand, defendant must continue to purchase the parts from plaintiff for the life of the part (*i.e.,* until defendant no longer uses or needs the parts) because defendant's need for the part is indefinite. Plaintiff's argument goes nowhere, for if the contract is indefinite, it is terminable at will.

"Where no minimum duration is stated in a contract, the general rule is that it is terminable at will by either party." *Zidell Explorations, Inc. v. Conval International, Limited,* 719 F.2d 1465, 1473 (9th Cir.1983), citing *Aaron E. Levine & Co., Inc. v. Calkraft Paper Co.,* 429 F.Supp. 1039, 1050 (E.D.Mich. 1976) ("[W]here the ... contract contained no express provision regarding its duration, the general rule appears to be that they are terminable at will by either party."). "It is not often that a promise will properly be interpreted as calling for a perpetual performance. Only in such negative promises as to forbear suit or not to carry on a business or occupation is so broad an interpretation likely to be permissible." 1 Williston on Contracts (3d ed.), § 38, p. 113; *Lichnovsky v. Ziebart International Corp.,* 414 Mich. 228, 243 n. 25, 324 N.W.2d 732 (1982). *See also Hayes v. Northwood Panelboard Co.,* 415 N.W.2d 687 (Minn.Ct.App.1987) (letter agreement contained no express or implied duration term therefore the agreement was of indefinite duration).

Plaintiff argues that *Delta Services and Equipment, Inc. v. Ryko Manufacturing Co.,* 908 F.2d 7, 11 (5th Cir.1990), prevents summary judgment. In *Delta,* the court said:

Delta [the exclusive distributor] argues that acceptance of such a policy [of interpreting the contract as one of an indefinite term] will encourage manufacturers to enlist the assistance of *distributors,* require them to invest money and time to promote the product and then terminate the contract before the *distributor* has recouped its investment or earned a fair profit for its efforts. We are persuaded that these fears are unfounded. A manufacturer could not terminate the contract if this rendered the contract unconscionable.... Also, § 2–309 states that if no duration is stated the contract "is valid for a reasonable time." ... The length of time the *distributor* requires to recover its investment and a reasonable profit is one of the factors the courts consider in arriving at a "reasonable" time.

*Id.* at 11 (emphasis added).

This specific language from *Delta,* suggesting that a distributor be allowed to recover

its investment and a reasonable profit before there is a determination that a reasonable contractual period has passed, is inapplicable to the situation at hand. The case at hand does not involve a distributorship agreement, let alone an exclusive distributorship agreement. Defendant has simply agreed to buy parts from plaintiff to use in defendant's construction of refrigerators. Defendant has not agreed to act, nor has it acted, as a distributor of plaintiff's product.

■ Second, and alternatively, if I were to ignore this distributorship distinction, then I would hold that the court's linkage in *Delta* of Uniform Commercial Code principles to a distributorship agreement is inapplicable to this case. In Michigan, a distributorship agreement between a manufacturer of goods and a distributor of goods which does not specifically state the quantity of goods in writing is *not* a contract for the sale of goods within the meaning of the Code. *Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 616, 358 N.W.2d 845 (1984).

Third, even if I were to examine the question as to a reasonable period of time for the duration of a contractual relationship as defined in *Delta* or M.C.L. § 440.2309(2), then as a matter of law, I would hold that the relationship in this case lasted for a reasonable period of time. The relationship began in 1985 and continued until the spring of 1992. Plaintiff has cited no authority for the proposition that seven years is an unreasonably short period of time in which to have a business relationship.[2]

Plaintiff argues that the situation at hand is akin to the situation in *Besco, Inc. v. Alpha Portland Cement Co.*, 619 F.2d 447 (5th Cir. 1980). In that case, the court held that although the contract for the sale of goods was of indefinite duration in the respect that its duration was not defined in units of time, the contract was still not terminable at will by either party because the parties had otherwise agreed to limit the seller's termination rights in a manner clearly disclosed in the contract. The contract involved in *Besco* reads as follows:

A. The exclusive right to purchase by ALPHA [the seller] to B & W SALES CO. [the buyer's assignor] *shall remain open and shall not be withdrawable* by ALPHA except on default by B & W SALES CO. as hereinafter defined.

B. The option shall continue indefinitely, subject always to the right in ALPHA, on and after September 1, 1975, to give written notice of intention to withdraw the exclusive right to purchase 90 days after the date of the notice, and subject also to the right in B & W SALES CO. after September 1, 1975, to give written notice of his intention to cease purchases hereunder 90 days after the date of the notice. *The right of ALPHA to withdraw* the exclusive right to purchase for said agricultural purposes *shall be based solely on* (1) either the failure of B & W SALES CO. to dispose of at least 20,000 tons of this material annually or (2) upon the unavailability of the material due to its use in the element manufacturing process at the ALPHA plant.

*Id.* at 448 (emphasis in original). In the case at hand, there is no language in the Release Terms and Conditions with regard to termination such as "exclusive" or "solely". Paragraph 11(a) of the Release Terms and Conditions discusses the buyer's right to terminate in a particular circumstance, whereas *Besco* pertains to the seller's right to terminate only in exclusive circumstances. Unlike the decision in *Besco*, which is not binding on this court, the parties here have not "otherwise agreed to limit [the seller's] termination rights in the manner clearly disclosed in the quoted provisions." *Id.* at 449.

### 2. *Reasonable Notice*

■ Plaintiff argues that defendant did not give it reasonable notice of termination. Plaintiff contends that while defendant was giving plaintiff line 1 work at the rate of $1 million per year in sales and line 5 work at

---

**2.** The fact that defendant purchased only 15% of plaintiff's line 5 work when the contract was terminated is not significant. Throughout its July 19, 1993, brief, plaintiff emphasizes its long-term relationship with defendant; thus the duration of plaintiff's line 5 work cannot be considered in a vacuum. If there was a termination of the parties' contractual relationship, it occurred many years after the overall relationship was formed.

the rate of $1.2 million per year in sales, defendant was "secretly" planning to halt such purchases. Defendant's decision to terminate the relationship with plaintiff was initially discussed between defendant's employees in late 1991, and the decision was made by defendant in February 1992. Deposition of Mike Gray at pp. 24, 48. Plaintiff complains it was not notified of this decision until two months later, April 1992, and that such "late" notice was in conformity with defendant's company policy of giving the supplier last-minute notice. *See* Exhibit W to plaintiff's July 19, 1993, brief, *Removal of WCI Tooling from Suppliers Plant.*

Plaintiff argues that had defendant provided earlier notice, significant expense to the plaintiff could have been avoided. In early April 1992, for example, plaintiff signed a lease/purchase agreement to buy a Toshiba 300–ton injection molder which is used to run the line 5 parts. This purchase of $169,000 was made less than three weeks before defendant notified plaintiff of the cessation of the business relationship.

Plaintiff argues that had it been notified in late 1991 of this possibility of cessation, it could have begun bidding for other work, would not have bought additional property for line 5 work in December 1991, and would not have hired new employees in early 1992.

However, in late 1991 employees of defendant only began discussing the possibility of ceasing the contractual relationship with plaintiff. No decision was made until February 1992. Thus, in late 1991 there was no decision about which plaintiff could have been informed. In a business climate, it clearly would be impractical to require company A to notify company B every time employees at company A begin to discuss the possibility of some action which would ultimately affect company B. M.C.L. § 440.-2309(3), U.C.C. § 2–309(3), says that "termination of a contract by one party . . . requires that reasonable notification be received by the other party." In other words, plaintiff is entitled to receive reasonable notice of the termination of the contract, not reasonable notice of initial discussions of the possibility of the termination of the contract.

Importantly, because defendant's notice to plaintiff of intent to cease contractual relationship was consistent with the terms of the contract, it is reasonable. Paragraphs 2 and 9 of the Release Terms and Conditions state that releases for future parts were binding only with regard to (1) parts scheduled for shipment over the next 45 days and (2) raw materials for parts due to be shipped over the next 60 days. In other words, defendant gave notice on April 28, 1992, that it intended to have the contractual relationship between the two parties expire. By June 25, 1992, which is after the 45–day time period for parts and just after the 60–day time period for raw materials, all releases which had been issued by defendant to plaintiff had been filled, and all parts and raw materials were invoiced and paid for. Beyond this time period, defendant had no contractual obligation to pay for the parts or raw materials. Defendant's notice then was consistent with the terms of the contract, and plaintiff makes no argument that the provisions regarding such time periods are unconscionable. Accordingly, the notice was reasonable as a matter of law.

## II. *Count II—Promissory Estoppel*

■ If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract. *Shurlow Tile and Carpet Co. v. Farhat,* 60 Mich.App. 486, 491, 231 N.W.2d 384 (1975); *Cloverdale Equipment Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 939 (6th Cir.1989). In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract. *Campbell v. Troy,* 42 Mich.App. 534, 537, 202 N.W.2d 547 (1972). This is because promissory estoppel is an alternative theory of recovery where no contract exists; and, thus, it is a substitute for consideration. *See Huhtala v. Travelers Insurance Co.,* 401 Mich. 118, 133, 257 N.W.2d 640 (1977) ("Promissory estoppel . . . substitutes for consideration in a case where there are no mutual promises."); *State Bank of Standish v. Curry,* 190 Mich.App. 616, 620, 476 N.W.2d 635 (1991), *affirmed in part and reversed in part,* 442 Mich. 76, 500 N.W.2d 104 (1993).

Here, the parties admit a contract exists but disagree on its scope, terms, and effect. Defendant is entitled to summary judgment on Count II.

IT SO ORDERED.