Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB









Opinion issued December 20,
2007


 

 

 

 

 








 

 








 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



No.    01-06-00440-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



ANAHEIM INDUSTRIES, INC. & FRANK GILCHRIST, INC.

d/b/a TEXAS STAGECOACH OF HOUSTON, Appellants

 

V.

 

GENERAL MOTORS CORPORATION, Appellee

 

 



On Appeal from the 55th District Court

Harris County, Texas

Trial Court Cause No. 2002-62430

 








MEMORANDUM OPINION

                                                                                                                   
                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             

Anaheim Industries, Inc. (Anaheim)
and Frank Gilchrist, Inc. d/b/a Texas Stagecoach of Houston (Stagecoach)
(collectively, the upfitters) appeal the trial court’s grant of summary
judgment in favor of General Motors (GM), claiming that, under Michigan law,
the trial court erred in granting GM summary judgment on their claims for (1)
breach of contract; (2) breach of the covenant of good faith and fair dealing;
(3) unconscionability; (4) economic duress; (5) promissory estoppel; (6)
negligent misrepresentation; and (7) fraud.  Because the trial court properly
concluded that the upfitters failed to raise a genuine issue of material fact
in support of any of these claims, we affirm.  

Background

 

The upfitters are engaged in the
business of customizing vans, trucks, and other vehicles by removing
factory-installed seating and other fixtures and installing premium products
and materials in their place.  The upfitters performed custom conversions for
GM as well as other vehicle manufacturers and dealers.  

GM provided its vehicles to
upfitters, also known as converters, through its Approved Converters Program. 
GM provided these converters with its Approved Converters Program Manual, which
sets forth policies and procedures to follow to qualify as an approved
converter as well as for ordering and processing the GM vehicles.  If an
upfitter qualified and GM selected it as an approved converter, they executed a
“pool converter agreement” with the converter.  

          The converter
agreement:

 

·       
reserves to GM the right to change
the manual in writing at any time; 

 

·       
reserves to GM the absolute right
to accept or reject orders; 

 

·       
does not require GM to provide any
particular number or any specific model of vehicle; 

 

·       
allows for termination at any time
by either party with written notice;  

 

·       
provides notice that “no waiver or
modification of any term of this agreement or the creation of additional terms
shall be valid or binding upon [GM] unless made in writing, executed on its
behalf”;  and 

 

·       
contains a merger clause providing
that the documents constituted the sole and complete agreement of the parties
and that they had no other agreements, either oral, or written, between them
with respect to their subject matter.  

 

Stagecoach and Anaheim entered their
first pool converter agreements with GM in approximately 1988.  GM from time to
time asked the upfitters to execute new agreements with revised terms, and they
did so.  




Over the years, consumer demand and
industry developments led GM to upgrade the interior seating and other features
available as factory-installed in its standard vehicle packages.  As the
formerly custom details became standard features installed on the GM assembly
line, the demand for custom conversion dwindled, and the number of vehicles
supplied to the upfitters declined.  Also, without notice to the upfitters, GM
began installing newly designed standard seating with integrated seatbelts in
its vehicles. This change in seat design made the installation of custom
seating unprofitable, which, until then, had been a popular custom feature.

As GM made fewer numbers and models
of vehicles available to the upfitters, the upfitters could not meet the
preferred volume of 300 vehicles set forth in the manual.  In December 1998, GM
put Stagecoach on probation in part because it had not converted the preferred
volume of vehicles.  Around the same time, GM had a new computer system
installed at Stagecoach for ordering vehicles.  The system did not work,
though, and Stagecoach was unable to order vehicles for four months.  GM
terminated its relationship with Stagecoach in May 1999.

Throughout this period, Anaheim continued its relationship with GM, but found it increasingly difficult to turn a
profit with the limited number and types of vehicles made available for
conversion.  As a result, Anaheim voluntarily terminated its agreement with GM
in 2001.

In 2002, both upfitters sued GM for
breach of contract, breach of a covenant of good faith and fair dealing,
economic duress, promissory estoppel, negligent misrepresentation, and fraud. 
GM moved for summary judgment under both the traditional and no-evidence
standard on the upfitters’ claims, which the trial court granted.  This appeal
followed.

Discussion

 

A.      Standards of
Review

 

GM moved for summary judgment against
the upfitters under both traditional and no-evidence grounds.  See Tex.
R. Civ. P. 166a(c), (i).  The traditional standard
for summary judgment requires a movant to show that no genuine issue of
material fact exists and that the trial court should grant judgment as a matter
of law.  Tex. R. Civ. P. 166a(c); KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).  We view all evidence in a light favorable to the
nonmovant and indulge every reasonable inference in the nonmovant’s favor.  Provident
Life & Accid. Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003).  We
review a no-evidence summary judgment de novo by construing the record in the
light most favorable to the nonmovant and disregarding all contrary evidence
and inferences.  Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706,
711 (Tex. 1997).  A nonmovant meets its burden and defeats a no-evidence motion
by bringing forth more than a scintilla of probative evidence that raises a
genuine issue of material fact.  See Tex.
R. Civ. P. 166a(i); Coastal Conduit & Ditching, Inc. v. Noram
Energy Corp., 29 S.W.3d 282, 284 (Tex. App.—Houston [14th Dist.] 2000, no
pet.).  When, as
here, the trial court’s order does not specify the grounds for granting summary judgment, we
affirm if any of the grounds raised by the movant is meritorious.  FM Props.
Operating co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000);  Oliphint
v. Richards, 167 S.W.3d 513, 516 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).

B.      Choice of Law

 

Both converter agreements contain
choice of law clauses specifying that Michigan law applies to any dispute arising
under them.  

C.      Michigan Law on Commercial
Contracts

Initially, we determine whether, as
the upfitters claim, the converter agreements are ambiguous and, to the extent
they are not, the manner in which they define the parties’ relationship.  

We depend on both the common law and
the UCC in making these determinations.  Among other goals, the UCC aims “to
make uniform the law among various jurisdictions.” Power
Press Sales Co. v. MSI Battle Creek Stamping,
238 Mich. App. 173, 180, 604 N.W.2d 772, 776 (1999) (quoting Mich. Comp. Laws Ann. § 440.1102(c)
(West 1994).  Accordingly, Michigan courts have found it appropriate to “seek
guidance from the decisions of other jurisdictions” when interpreting UCC
provisions.  Id.; see Conagra, Inc. v. Farmers State Bank, 237 Mich. App. 109, 121, 602 N.W.2d 390, 396 (1999).  In keeping with Michigan’s judicial
policy, we, too, look to other jurisdictions for guidance in interpreting the
UCC provisions at issue.  

“In ascertaining the meaning of a contract, we
give the words used in the contract their plain and ordinary meaning that would
be apparent to a reader of the instrument.” 
Rory
v. Cont’l Ins. Co., 473 Mich. 457, 464, 703 N.W.2d 23, 28 (2005).  Further,
“[w]e read contracts as a whole, giving harmonious effect, if possible, to each
word and phrase.”  Wilkie v. Auto-Owners Ins. Co., 469 Mich. 41, 50
n.11, 664 N.W.2d 776, 781 n.11 (2003); see also Klapp v. United Ins.
Group Agency, Inc., 468 Mich. 459, 468, 663 N.W.2d 447, 453 (2003)
(declaring that courts must “give effect to every word, phrase, and clause in a
contract and avoid an interpretation that would render any part of the contract
surplusage”).




1.       Ambiguity

The upfitters contend that the following
manual provision renders the converter agreements ambiguous:  

Annual Volume: The preferred annual volume is 300
units.  An exception would be low volume manufacturers for which special
consideration is required due to a strong reputation for customer satisfaction,
special geographic locations or strong and long standing relationships with
local Chevrolet dealers.  Facilities and sales support should be adequate to
grow over time – with minimum inventory turn rates of 6 times per year.

 

Specifically, the upfitters claim
that this provision potentially conflicts with the express disclaimer that GM
is not obligated to deliver any particular number or type of vehicles to its
upfitters, and urge us to allow the jury to find whether the annual volume
provision imposes a requirement that the upfitters customize at least 300
vehicles per year and, in turn, a corresponding requirement that GM provide
sufficient vehicles.  

The threshold issue of whether
contract language is clear or ambiguous is a question of law for the court.  Wilkie,
469 Mich. at 61, 664 N.W.2d at 787; Port Huron Educ. Ass’n v. Port Huron Area Sch. Dist., 452 Mich. 309, 323, 550 N.W.2d 228, 237 (1996).  Contract
language is ambiguous if it “may reasonably be understood in different ways.”  Raska
v. Farm Bur. Ins. Co., 412 Mich. 355, 362, 314 N.W.2d 440, 441 (1982), quoted
in UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 228 Mich. App. 486, 491,
579 N.W.2d 411, 414 (1998).  Courts must not create ambiguity where none
exists.  Mahnick v. Bell Co., 256 Mich. App. 154, 159, 662 N.W.2d 830, 833 (2003).  Even if a contract is inartfully
worded, it is not ambiguous if it “fairly admits of but one interpretation.”  Meagher
v. Wayne State Univ., 222 Mich. App. 700, 722, 565 N.W.2d 401, 415
(1997).    

Parol evidence may not be used to
contradict or vary the terms of an unambiguous contract.  Schmude Oil Co. v.
Omar Operating Co., 184 Mich. App. 574, 580, 458 N.W.2d 659, 663 (1990), quoted
in UAW-GM Human Res. Ctr., 228 Mich. App. at 492, 579 N.W.2d at 414.   It
may be used to prove the existence of a latent ambiguity, but is otherwise
admissible only to clarify the meaning of an ambiguous contract.  Meagher,
222 Mich. App. at 722, 565 N.W.2d at 415.  

The converter agreements allow the
upfitters to order vehicles, subject to GM’s acceptance or rejection.  The
manual provision language relied on by the upfitters contains no language
making the annual volume required or mandatory.  To the contrary, it expressly
refers to the “preferred annual volume” of vehicles.  We may not rewrite
this provision by discarding one word and replacing it with one that has a wholly
different meaning. 

Accepting the upfitters’ proposed
interpretation would also render ineffective the provision in the converter
agreement expressly reserving to GM “absolute discretion” over whether to
accept or reject an upfitter’s order.  We may not change the plain meaning of a
term to create an ambiguity where none exists.  See Glenwood
Shopping Ctr. Ltd. v. K Mart Corp.,
136 Mich. App. 90, 99, 356 N.W.2d 281, 286 (1984);
cf. Lytle v. Malady, 458 Mich. 153, 166, 579 N.W.2d 906, 911 (1998) (explaining that written policy in employee
handbook that “[n]o employee will be
terminated without proper cause or reason and not until management has made a
careful review of the facts” was insufficient to overcome express disclaimer
that “[t]he contents of this booklet are not intended to establish . . .
any contract between . . . [the employer] and any employee, or group
of employees”) (alteration in original);  Fed. Express Corp. v.
Dutschmann, 846 S.W.2d 282, 283 (Tex. 1993) (determining that express
disclaimer in employee handbook negated any implication that “Guaranteed Fair
Treatment Procedure” outlined in personnel procedures manual placed restriction
on company’s right to terminate employment at will).  Thus, we conclude that
the converter agreements do not contain any ambiguity concerning GM’s
unfettered discretion over whether to accept vehicle orders from the upfitters.[1]


2.       Quantity
term

 

          The UCC statute of frauds
provides:

Except as otherwise provided in this section, a
contract for the sale of goods for the price of $1,000.00 or more is not
enforceable by way of action or defense unless there is a writing sufficient to
indicate that a contract for sale has been made between the parties and signed
by the party against whom enforcement is sought or by his or her authorized
agent or broker. A writing is not insufficient because it omits or incorrectly
states a term agreed upon but the contract is not enforceable under this
subsection beyond the quantity of goods shown in the writing.

 

Mich. Comp.
Laws Ann. § 440.2201(1)
(West Supp. 2007).  A party may not use course of performance or other parol
evidence to supply a quantity term.  In re Estate of Frost, 130 Mich. App. 556, 559, 344 N.W.2d 331, 333 (1983).  Moreover, the quantity term may
not be inferred, and must be written.  Lorenz Supply Co. v. Am. Standard,
419 Mich. 610, 614–15, 358 N.W.2d 845, 847 (1984).

Brooklyn Bagel Boys, Inc. v.
Earthgrains Refrigerated Dough Products, Inc., 212 F.3d 373 (7th Cir. 2000), is helpful in
determining the legal effect of the converter agreements.  In that case,
Earthgrains contracted with Brooklyn Bagel, a producer of bagels for third
parties, to be a co-packer for the distribution of bagels out of its regional
facility in Alabama.  Id. at 375-76.  The agreement provided that
Brooklyn Bagel would process and package bagels for Earthgrains under its brand
and would purchase all of the raw materials and packaging supplies necessary to
produce bagels at Earthgrains’ regional facility in Illinois.  Id. at 376.  The agreement also defined a pricing structure, but did not require
Earthgrains to purchase any specific quantity of bagels from Brooklyn Bagel.  Id.  Instead, it obligated Brooklyn Bagel to process and pack the “ordered quantity”
of bagels.  Id.  

The court of appeals determined that
the agreement, standing alone, did not expressly obligate Earthgrains to buy
all or any specified quantity of its bagel requirements from Brooklyn Bagel.  Id. at 379.  Rather, the court observed, the agreement gave Earthgrains complete
discretion concerning whether to order any or all of its bagel needs from
Brooklyn Bagel.  The agreement did not contain any language indicating that it
would be a breach of contract for Earthgrains either to (1) stop ordering from
Brooklyn Bagel, (2) use another manufacturer, or (3) manufacture its own
bagels.  Id. at 379–80.  The court concluded that, “[u]nder the
[agreement], Earthgrains clearly had no obligation to buy all, let alone any
quantity, of its bagel requirements from Brooklyn Bagel.”[2] 
 Id. at 379.  

Similarly, here, the converter
agreements confer absolute discretion on GM concerning whether to accept any,
all, or part of the upfitters’ vehicle orders.  They also outline the
requirements that the upfitters must satisfy so that they may qualify as
“approved converters” to order vehicles from GM.  Like the agreement in Brooklyn
Bagel, the converter agreements do not, standing alone, constitute
enforceable contracts.  They expressly state that a “Manufacturer’s orders for
Vehicles are not binding on Chevrolet until accepted by Chevrolet, and may be
cancelled by Manufacturer until that time.”  Consequently, no enforceable
contract exists until GM accepts an upfitter’s purchase order.  Each of the
accepted purchase orders specifies a quantity term which, together with the
converter agreement, forms a contract that satisfies the UCC statute of frauds. 
We thus view the relationship between each upfitter and GM as governed by a
series of contracts.[3]  See id. at 379 n.4 (approving district court’s view of parties’ relationship as
series of separate contracts, with added element that several of terms would
relate back to original agreement, on theory that each time Earthgrains placed
order for bagels, contract was created); Benedict Mfg. Co. v. Aeroquip Corp.,
No. 242563, 2004 WL 1532280, at *4–6 (Mich. App. Jul. 8, 2004) (per curiam) (finding
that parties’ course of performance substantiated existence of contract because
plaintiff manufactured parts and supplied them to defendant on demand at
negotiated price when it received purchase orders and releases; purchase orders
supplied statement of quantity).   




D.      The Upfitters’
Claims 

 

1.       Breach
of contract

 

The upfitters contend that the trial
court erred in granting summary judgment on their breach of contract claims,
asserting that the evidence raises a fact issue concerning whether GM breached
the converter agreements.  The upfitters’ request that we consider the parties’
course of performance in determining whether GM limited or modified its rights
in a way that is not reflected in the agreements.  Course of performance may be
relevant to show waiver or modification of a written term.  Mich. Comp. Laws Ann. § 440.2208(3)
(West 1994); accord Tex. Bus.
& Com. Code Ann. § 1.303(f) (Vernon Supp. 2007).  

Both the UCC and the converter
agreements prohibit consideration of the parties’ course of performance to the
extent that it is not consistent with the language of the agreements.  When an
alleged course of performance conflicts with the express terms governing a
contractual relationship, the express terms prevail.  Mich. Comp. Laws Ann. § 440.1205(4) (West 1994); accord Tex. Bus. & Com. Code § 1.303; see
Blalock Mach. & Equip. Co. v. Iowa Mfg. Co., 576 F. Supp. 774, 777-78
(N.D. Ga. 1983).  Further, “[a] signed agreement which excludes modification or
rescission except by a signed writing cannot otherwise be modified.”  Mich. Comp. Laws Ann. § 440.2209(2)
(West 1994); accord Tex. Bus.
& Com. Code Ann. § 2.209(b) (Vernon 1994).  The converter agreements
specifically provide that “no waiver or modification of any term of this
agreement or creation of additional terms shall be valid or binding upon [GM]
unless made in writing, executed on its behalf.”   

Our conclusion that converter
agreements alone do not constitute enforceable contracts under Michigan law until GM accepts an order for vehicles is dispositive of this claim.  The
upfitters do not allege that GM failed to satisfy any term of the converter
agreement after committing to fulfill a purchase order.   Absent an accepted
purchase order, the upfitters cannot demonstrate that GM breached the only
obligation that would bind it under the converter agreements.  The trial court,
therefore, correctly granted summary judgment on the upfitters’ breach of
contract claims.  

2.       UCC
claims

 

a.       Breach of the implied covenant of good faith
and fair dealing

 

The upfitters contend that the trial
court erred in summarily dismissing their claim that GM breached the duty of
good faith and fair dealing implied under Michigan law.  They specifically
allege that GM breached that duty by: 

·       
modifying the contract language to
expand GM’s discretionary authority;

 

·       
releasing new SUV models that
incorporated new standard features that previously had been available only
through customization and altering the seat belt mounts so that it was
infeasible for the upfitters to install high value seat packages, both of which
effectively shut the upfitters out from work they previously had performed; 

 

·       
failing to provide the number of
vehicles and the particular vehicle models the upfitters requested and
requiring them to accept less marketable vehicles in order to obtain other,
more marketable, vehicles; and

 

·       
terminating its agreement with
Stagecoach for failure to customize the “preferred annual volume” of customized
vehicles when the agreement gave GM absolute discretion over the number and
type of vehicles it would provide to Stagecoach.

 

Neither the converter agreements nor
the duty of good faith obligated GM to perform otherwise.  The UCC imposes a good faith duty of “honesty in fact in the conduct or transaction
concerned.”  Mich. Comp. Laws Ann. §§
440.1201(119), 440.1203 (West 1994 & Supp. 2007).   This good faith duty
extends to the performance, enforcement, and modification of an agreement.  Id.  The official comment to this section explains the duty’s function as follows: 

This section does not support an independent cause of
action for failure to perform or enforce in good faith. Rather, this section means
that a failure to perform or enforce, in good faith, a specific duty or
obligation under the contract, constitutes a breach of that contract or makes
unavailable, under the particular circumstances, a remedial right or power.  This
distinction makes it clear that the doctrine of good faith merely directs a
court towards interpreting contracts within the commercial context in which
they are created, performed, and enforced, and does not create a separate
duty of fairness and reasonableness which can be independently breached. 

 

Mich. Comp.
Law § 440.1203 (emphasis
added), quoted in Whirlpool v. Grigoleit, No. 1:06-CV-195, 2007 WL
397030, *5 (W.D. Mich. Feb. 1, 2007).  The implied covenant of good faith and
fair dealing thus “serves to supply limits on the parties’ conduct when their
contract defers decision on a particular term, omits terms or provides
ambiguous terms.”  Hubbard Chevrolet Co. v. Gen. Motors Corp., 873 F.2d
873, 876–77 (5th Cir. 1989) (applying Michigan law); accord N. Nat. Gas Co.
v. Conoco, Inc., 986 S.W.2d 603, 606–07 (Tex. 1998) (“In the absence of a
specific duty or obligation [in the contract] to which the good-faith standard
could be tied, section 1.203 will not support [the plaintiff’s] claim for
damages.”); Fetter v. Wells Fargo Bank Tex., 110 S.W.3d 683, 689 (Tex. App.—Houston
[14th Dist.] 2003, no pet.) (same); Adolph Coors Co. v. Rodriguez, 780
S.W.2d 477, 482, 482 (Tex. App.—Corpus Christi 1989, writ denied) (explaining
that UCC “duty of good faith and fair dealing is aimed at making effective the
agreement’s promises”), cited with approval in N. Nat. Gas, 986 S.W.2d
at 606.  

Conversely, Michigan law does not
imply a covenant of good faith and fair dealing when the parties to an
agreement have “unmistakably expressed” their respective rights.  Hubbard
Chevrolet Co., 873 F.2d at 877.  Existing only in the interstices of a
contract’s provisions, the good faith duty cannot override or replace express
contractual terms.   Aetna Cas. & Sur. Co. v. Dow Chem. Co.,
883 F. Supp. 1101, 1111 (E.D. Mich. 1995); Van Arnem Co. v. Mfrs. Hanover
Leas. Corp., 776 F. Supp. 1220, 1223 (E.D. Mich. 1991); accord Blalock
Mach., 576 F. Supp. at 777–78; Adolph Coors Co., 780 S.W.2d at 482
(warning that if fact-finder may write into contract other terms it believes
are fair under circumstances, any contract is subject to being rewritten to
better suit court’s or jury’s view of what parties should in “good faith” have
included in agreement, regardless of what parties actually did or did not
provide).  

The converter agreements contain
specific, “unmistakably expressed” terms addressing and authorizing the conduct
about which the upfitters complain, and compel dismissal of this claim as a
matter of law.  The agreements expressly authorize GM to modify agreement from
time to time in writing; grant GM absolute discretion to accept or reject the
upfitters’ vehicle orders; and allow either party to terminate the agreement on
notice to the other.  By acceding to the converter contracts, the upfitters
agreed that GM’s exercise of discretion over the identified subjects would
constitute good faith, regardless of its motivation for doing so.  For example,
the termination provision of the converter agreements expressly provides:

This Agreement may be terminated by either party at
any time by written notice thereof to the other party.  Written notice of
termination shall be delivered personally or by certified mail, return receipt
requested; termination shall be effective at the end of the third business day
after the day of receipt of such written notice or at such later time as may be
set forth in such notice.

 

In executing this provision, the
parties mutually agreed that no showing of cause for termination was necessary
and no reason for exercising that right would amount to bad faith.  See
Hubbard Chevrolet, 873 F.2d at 877–78.  When a termination notice complies
with the terms of the parties’ contract, it is reasonable.  Adv. Plastics
Corp. v. White Consol. Indus., Inc., 828 F. Supp. 484, 491 (E.D. Mich.
1993), aff’d, 47 F.3d 1167 (6th Cir. 1995).[4] 
Consequently, GM’s reasons for exercising its right to terminate its
relationship with Stagecoach does not raise any issue of fact supporting the
upfitters’ breach claim.  See Corenswet, Inc. v. Amana Refrigeration, Inc.,
594 F.2d 129, 138 (5th Cir. 1979) (“When a contract contains a provision
expressly sanctioning termination without cause there is no room for implying a
term that bars such a termination.”); cf. Tex. Farm Bur. Mut. Ins. Co. v.
Sears, 84 S.W.3d 604, 609 (Tex. 2002) (reasoning that, because employment-at-will
doctrine does not require employer to be reasonable in making termination
decisions and allows employer to discharge employee for bad reasons without
liability, employer cannot incur liability when it terminates employee for
carelessly formed reasons).  

Likewise, the converter agreements have
no provision either restricting GM’s own ability to modify vehicles and upgrade
the available standard options to enhance their appeal and improve GM’s profit
margin, or requiring GM to accept the upfitters’ orders for any particular type
or number of vehicles.  To conclude that GM acted in bad faith for its conduct
would require GM to waive its contractual rights, contrary to Michigan law.  See
Van Arnem Co., 776 F. Supp. at 1223 (holding that defendant was entitled
to advance own interests by enforcement of contract terms and was not required
to forgo enforcement to put plaintiff’s interests ahead of its own).

b.      Unconscionability

 

The upfitters next contend that GM’s
actions in either actually or effectively terminating the converter agreements
and in modifying the contract language expanding GM’s discretion in accepting
vehicle orders are unconscionable.  The party seeking to prove
unconscionability must show that the challenged contract or term is both
procedurally and substantively unconscionable.  Clark v. DaimlerChrysler
Corp., 268 Mich. App. 138, 143, 706 N.W.2d 471, 474 (2005).  

“Procedural unconscionability exists
where the weaker party had no realistic alternative to acceptance of the
term.”  Id.; see also In re Halliburton Co., 80 S.W.3d 566, 571 (Tex. 2002) (explaining that procedural unconscionability relates to actual making or
inducement of contract provision).  Whether the contract is one of adhesion has
no bearing on whether it is procedurally unconscionable.  Clark, 268
Mich. App. at 143, 706 N.W.2d at 474; accord In re Halliburton Co., 80
S.W.3d at 572 (observing that contract provision is not procedurally
unconscionable simply because party with superior bargaining power makes “take
it or leave it” offer, leaving weaker party with no opportunity to negotiate). 
If the circumstances surrounding the contract formation show that the weaker
party could have freely accepted or rejected the contract, it is not
procedurally unconscionable.  Clark, 268 Mich. App. at 144, 706 N.W.2d
at 475.  




In defining substantive
unconscionability, the Clark court explained that it

exists where the challenged term is not substantively
reasonable. However, a contract or contract provision is not invariably substantively
unconscionable simply because it is foolish for one party and very advantageous
to the other.  Instead, a term is substantively unreasonable where the inequity
of the term is so extreme as to shock the conscience.

 

Id. (citing Allen v. Mich. Bell Tel. Co., 18 Mich.
App. 632, 637–38, 171 N.W.2d 689, 692 (1969), and Gillam v. Mich. Mtg.-Inv.
Corp., 224 Mich. 405, 409, 194 N.W. 981, 982 (1923)); accord In re
FirstMerit Bank, N.A., 52 S.W.3d 749, 757 (Tex. 2001) (“The principle [of
allowing relief for unconscionability] is one of preventing oppression and
unfair surprise and not of disturbing allocation of risks because of superior
bargaining power.”).

          The court decides as a
matter of law whether a contract term is unconscionable.  See Mich. Comp. Laws Ann. § 440.2302(1)
(West 1994).   The high threshold a party must meet in proving
unconscionability stems from the strong policy favoring freedom of contract. 
As the Michigan Supreme Court declared:

The general rule of contracts is that competent persons
shall have the utmost liberty of contracting and that their agreements
voluntarily and fairly made shall be held valid and enforced in the courts. 
Under this legal principle, the parties are generally free to agree to whatever
they like, and, in most circumstances, it is beyond the authority of the courts
to interfere with the parties’ agreement.  

 

Wilkie, 469 Mich. at 62–63, 664 N.W.2d at
787–88 (quotations, citations, and footnotes omitted); see also WXON-TV,
Inc. v. A.C. Nielsen Co., 740 F. Supp. 1261, 1264 (E.D. Mich. 1990) (“The
law presumes that business people are fully competent to enter into contracts
and obligate themselves to perform in any manner they wish.  The courts have no
authority to rewrite the terms of a contract because they might feel that it
was an unwise agreement for a party to have entered into.”).  Neither of the
upfitters’ challenges approaches this threshold.  

          The upfitters’ first claim
of unconscionability, which concerns GM’s conduct leading to the termination of
the parties’ relationships, does not raise a fact issue for the same reason it
does not support a claim for breach of the duty of good faith and fair
dealing.  In their second claim, the upfitters assert that GM’s alteration of
the converter agreement language addressing the scope of GM’s discretion was
unconscionable.  The upfitters point out that the converter agreements
originally provided that “[GM] shall have no obligation to deliver to [the
upfitter] any model or number of vehicles, but may deliver to [the upfitter]
such number and type of vehicles as requested by [the upfitter] as it deems
appropriate,” but that GM later changed that provision to state that “[t]here
are numerous factors which affect the availability of vehicles to [GM] and [GM]
reserves to itself discretion in accepting orders and distributing vehicles and
its judgment in such matters shall be final.”  We do not construe the former
language as limiting GM’s discretion as to the quantity of vehicles ordered and
consequently, do not view the alteration, which expressly confers absolute
discretion to GM, as material.  Even if it were, the change in language is not unconscionable.  
Procedurally, we note that the upfitters agreed at the outset that GM would
have unrestricted power to modify the terms of the converter agreement.  The
upfitters could either accept the modification by continuing to perform under
the agreements or notify GM that they were terminating the relationship.  See
Mich. Comp. Laws Ann. §
440.2208(1) (West 1994) (providing that, where “contract for sale involves
repeated occasions for performance by either party with knowledge of the nature
of the performance and opportunity for objection to it by the other, any course
of performance accepted or acquiesced in without objection shall be relevant to
determine the meaning of the agreement”); see also Hathaway v. Gen.
Mills, Inc., 711 S.W.2d 227, 229 (Tex. 1986) (explaining
that employer may enforce changes to at-will employment contract if it
unequivocally provides notice of definite change and employee accepts change by
continuing employment).  Accordingly, the trial court properly granted summary
judgment on this claim.  

3.       Extracontractual claims



                   a.       Economic
duress

 

The upfitters’ economic duress claim
rests on their allegations that GM threatened to further reduce the number of
more marketable vehicle models available to them if they failed to accept less
marketable models and also imposed minimum volume requirements after the upfitters
had already entered into converter agreements and begun performance.  To
succeed on a claim of duress and void an otherwise valid contract under Michigan law, a plaintiff must prove that the defendant illegally compelled or coerced the
plaintiff to act by fear of serious injury to it, its reputation, or its fortune.  Norton v. Mich. State Hwy. Dep’t, 315 Mich. 313, 319–20, 24 N.W.2d 132, 135 (1946).  

No evidence raises a fact issue that
GM threatened to do anything it did not have a legal right to do.  Either party
had the power to terminate the contract at will with notice.  At no time did
any alleged action by GM impair the upfitters’ ability to terminate their expressly
at-will relationship with GM if they considered it to be unfair or oppressive. 


The upfitters also fail to show that GM
had any legal duty to continue provide them with certain types and numbers of vehicles,
or forgo its own modification of its vehicle line as a means of maximizing its
profit.  “[E]conomic duress requires a showing of illegal conduct.”  Whirlpool,
2007 WL 397030, at *4.  The upfitters allege that GM attempted to coerce them
into accepting less marketable vehicles by tying their delivery to the more
marketable ones, but fail to provide any evidentiary support that GM’s actual
conduct violated their agreement or any law.  Consequently, the trial court
correctly granted summary judgment dismissing the upfitters’ economic duress
claim.

b.      Promissory estoppel, negligent
misrepresentation, and fraud

 

The upfitters base their promissory
estoppel, negligent misrepresentation, and fraud claims on GM’s alleged oral
assurances that they would receive a reasonable allocation of marketable
product, allocations would return to normal, GM products would remain suitable
for conversion, GM would not compete with them, and GM would require its
dealers to use approved converters exclusively.  All three claims, however,
require upfitters to show that their reliance on GM’s alleged oral
representations was reasonable.  See Adv. Plastics Corp., 828 F. Supp.
at 491 (promissory estoppel); Novak v. Nationwide Mut. Ins. Co., 235 Mich. App. 675, 688, 599 N.W.2d 546, 553 (1999) (misrepresentation and fraud).  Because the converter agreements expressly
prohibit reliance on any waiver or modification of any term or creation of
additional terms unless made in writing and executed by GM, and the upfitters’
reliance conflicts with the plain language of the agreement reserving full
discretion to GM, the upfitters cannot demonstrate the reasonableness of their
reliance on any of GM’s oral assurances as a matter of law.  See Novak,
235 Mich. App. at 689–691, 599 N.W.2d at 553–54 (holding that plaintiff’s reliance is unreasonable as matter of law when
terms of parties’ contract specifically contradict representations on which
plaintiff claims to have relied).   

Moreover, GM did not owe any special
duty to the upfitters to disclose its own business plans.  GM and the upfitters
were parties to commercial relations defined by their respective agreements,
not by any independent duty owed by GM to act for the benefit of the upfitters
or refrain from acting in its own interest at the
upfitters’ expense.  See Central Cartage Co. v. Fewless, 232 Mich. App.
517, 524–25, 591 N.W.2d 422, 426 (1998); see also McDerment v.
Biltmore Props., Inc., No. 257155, 2005 WL
3556147, at *6 (Mich. App. Dec. 29, 2005) (per curiam) (declaring that person
may not reasonably place trust and confidence in another when their interests
are adverse).  Because these reasons support the trial court’s grant of summary
judgment on the upfitters’ fraud, promissory estoppel, and misrepresentation
claims, we need not examine the remaining grounds.  




Conclusion

 

We agree with the trial court that
the upfitters did not present any genuine issue of material fact supporting
their claims for breach of contract, breach of the covenant of good faith and
fair dealing, unconscionability, economic duress, promissory estoppel,
negligent misrepresentation, or fraud.  We therefore affirm the judgment of the
trial court.

 

 

Jane Bland

                                                          Justice

 

Panel
consists of Chief Justice Radack and Justices Alcala and Bland.

 

 

 









[1]
The upfitters’ reliance on Salpietra v.
Kinder Properties, No. 248153, 2004 WL 2601209, at *2 (Mich. App. Nov. 16,
2004) (per curiam) is misplaced.  In that case, the plaintiffs purchased a
residential lot from the project developer defendant, only to discover that the
lot had been improperly graded and filled.  The trial court granted summary
judgment, concluding that the plaintiffs’ purchase agreement imposed no duty to
provide suitable soil.  The Michigan court of appeals reversed, noting that the
agreement was ambiguous in that it specifically stated that the property was a
“building site suitable and ready for construction of a residence.”  Id.  In contrast, neither the converter agreements nor the guidebook in this case
obligate GM to place a certain quantity of orders with the upfitters.  





[2] In Acemco, Inc. v. Olympic Steel
Lafayette, Inc., a Michigan court of appeals reached the same conclusion
concerning the following language: “During the term of this Agreement, the
Seller agrees to sell to the Buyer such quantities of the Products as the Buyer
may specify in its purchase orders, which the buyer may deliver at its
discretion.”  No. 256638, 2005 WL 2810716, at *4 (Mich. App. Oct. 27, 2005)
(per curiam).  The court declared: 

 

Reasonable minds could not construe the
above language as containing a quantity term because the language specifies no
quantity whatsoever. The language instead grants complete discretion to the
buyer to deliver purchase orders containing any amount or no amount at its
discretion without any other limiting feature. The grant of complete discretion
results in a countless number of possible quantities from zero to infinity. “Any”
quantity is in fact no quantity at all. 

 

  Id.

 





[3]
The Brooklyn Bagel court primarily viewed
the parties’ relationship as creating an enforceable buyer’s option contract.  Brooklyn
Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc., 212 F.3d
373, 379 (7th Cir. 2000).  Because the cases addressing Michigan’s UCC statute
of frauds do not appear to favor this view, which would allow for enforcement
of an agreement without a quantity term even though the agreement is neither a
requirements nor an output contract, we do not endorse it for purposes of our
analysis of the converter agreements.  See, e.g., Acemco, Inc., 2005 WL 2810716, at *4; see also Merritt
Campbell v. RxP Prods., Inc., 164 F.3d 957, 963 (5th Cir. 1999) (explaining
that agreement would have been option contract but was unenforceable for
failure to satisfy UCC statute of frauds).

 





[4]
The resolution of analogous facts in Brooklyn
Bagel also supports the trial court’s judgment in this case.  See 212
F.3d at 376.  Brooklyn Bagel and Earthgrains had performed under the contract
for nearly two years when Earthgrains, without informing Brooklyn Bagel, decided
to begin manufacturing its own bagels.  Id.  A few months later, after
Earthgrains finished installing bagel-making equipment in its Illinois
facility, it sent a ninety-day written notice to Brooklyn Bagel of its intent
to terminate the contract.  Id.  In affirming summary judgment against
Brooklyn Bagel’s claim for breach of the duty of good faith and fair dealing,
the Seventh Circuit noted that nothing in contract prohibited Earthgrains from
manufacturing its own bagels, and Brooklyn Bagel did not show that Earthgrains’
conduct could not reasonably have been contemplated by parties.  Id. at 382.